A jury awarded the plaintiffs, Morris Wayne ("Wayne") Forbus and Mary C. Forbus, $300,000 on fraud claims against the defendants, City Realty Company, Inc., and Martha Cochran.
Underlying this case are the Forbuses' attempts to purchase property "listed" for sale by the president/manager of City Realty, Martha Cochran. Ultimately, Cochran, along with her husband and son, bought the property. The Forbuses sued Cochran and City Realty, averring that Cochran had engaged in fraudulent behavior in order to obtain the property, and, the Forbuses alleged, to prevent them from purchasing the property.
In a separate lawsuit, City Realty's "errors and omissions" insurer, Continental Casualty Company (referred to hereinafter as "CNA") had sued the Forbuses and City Realty for a judgment declaring the extent of City Realty's insurance coverage in the event the Forbuses prevailed at trial. CNA argued that City Realty was not covered for the type of behavior alleged by the Forbuses. CNA obtained a summary judgment in its favor and from this judgment City Realty appeals (case 1911427).
Thus, these three appeals involve two related cases, one in which the Forbuses sued City Realty and Martha Cochran based on theories of fraud, and one in which City Realty's insurer sued the Forbuses and City Realty, arguing that it had no contractual obligation to pay any judgment that the Forbuses might obtain.
After the Forbus trial, the court held the jury verdict in favor of the Forbuses to be excessive by $45,000. The Forbuses appeal from the trial court's order of remittitur (case 1911687).
Also, the trial court denied City Realty and Cochran's motion for a j.n.o.v. They appeal from that denial (case 1911599) (in addition to appealing from the judgment in favor of City Realty's insurer, which left City Realty without coverage for the award).
In the spring of 1990, City Realty and Mrs. Eunice Mae Blair were parties to a "listing agreement" for the sale of a house and adjoining acreage owned by Mrs. Blair. In late May 1990, an acquaintance of Mrs. Blair, Russell Lawhorn, expressed an interest in buying the property. According to Mrs. Blair, her willingness to sell for $90,000 was conveyed to Lawhorn through her listing agent, Cochran. She testified that Lawhorn, however, did not agree to purchase her property. In contrast, Cochran testified that Lawhorn offered to purchase the property for $90,000 and that Mrs. Blair agreed to this price in Cochran's presence.
It is undisputed that Cochran did not undertake to prepare for a closing on a purported Lawhorn sale, nor was there ever any written contract for a sale to Lawhorn.
Approximately a month later, Wayne Forbus attempted to make an offer on the Blair property through City Realty agent Amanda Scoggins. Scoggins testified that client offers have to be submitted to the seller through the listing agent; here, that was Cochran.[1] Scoggins stated, "I called Martha [Cochran] and told her I had an [oral] offer on the Blair house of $85,000 [from the Forbuses] and did I need to [do a written proposed] contract." According to Scoggins, Cochran said "[N]o, I've got a contract pending." At trial, Cochran denied suggesting that Scoggins not put the Forbus offer in writing, but conceded that she did tell Scoggins that a contract was "pending," meaning, she testified, her purported understanding that Lawhorn was buying the property. It is undisputed that there was no written contract for sale on the property "pending" a closing. *Page 1042 
The Forbuses allege that Cochran discouraged a Blair-to-Forbus sale by suggesting that Scoggins not tender a written offer on the Blair property.
Unknown to the Forbuses, their interest in purchasing the Blair property for $85,000 was not related to Mrs. Blair. Mrs. Blair testified, without objection, that had she known the Forbuses were willing to pay $85,000 she would have been willing to sell them the property for that amount.
On June 25, 1990, Cochran received word through Mrs. Blair's daughter that Mrs. Blair was very anxious to sell. According to Cochran, she contacted Lawhorn, who told Cochran that he would not buy the property.
Cochran then telephoned Scoggins, and, according to Scoggins, told her to "get in touch with your people [the Forbuses]," and told her, "Mrs. Blair is awfully desperate to sell; she's anxious to sell. It's just urgent. . . ." Scoggins stated that she told Cochran that she would get in touch with the Forbuses about making another offer. Scoggins then called Mary Forbus, who was, according to Scoggins, "excited" but wanted to see the property again and could not do so until the next day, June 26. Scoggins did not notify Cochran of this fact.
That evening, Cochran spoke by telephone with Mrs. Blair's daughter. Cochran testified that Mrs. Blair's daughter told her that she had previously received from Mary Forbus a note in which Mary Forbus offered to buy the Blair property for $70,000.[2] According to Cochran, Mrs. Blair's daughter had concluded that the Forbuses would not offer more than $70,000. Cochran did not disclose the Forbuses' willingness to offer $85,000. Instead, Cochran stated that she herself was willing to purchase the property for $70,000.
The next afternoon, June 26, Amanda Scoggins went to City Realty to pick up the agency's key to the Blair house, so that she and Mary Forbus could look at it, as they had planned. Mary Forbus waited outside. Cochran, who was in the City Realty offices at the time, testified that she told Scoggins the property was sold.
The property was not, in fact, sold. Also, although Cochran testified at trial that "an agreement had been reached," it is undisputed that there was no written contract for sale at that time. This "agreement" apparently refers to either an oral understanding between Cochran and Mrs. Blair'sdaughter, or a written offer by Cochran that Mrs. Blair had not then accepted.
Cochran told Scoggins that she, her husband, and her son had bought the property for $70,000. Scoggins testified:
 "I said, 'Well, why would she accept it [$70,000]?' and she said, 'Amanda, you just didn't understand the urgency of this sale. . . .' I said, 'Well, I have Mary out here in the car ready to make an offer on the Blair house.' I said, 'I don't know what to do.' She said, 'Well, just explain to her that it's sold but don't tell her what it sold for.' "
As instructed, Scoggins told Mary Forbus that the property was sold. Scoggins also testified that she untruthfully told Mary that she did not know the sale price. According to Scoggins, upon hearing the news of the sale Mary "was in tears. . . . Mary just cried."
The next day, June 27, Cochran and her husband travelled to Georgia to meet Mrs. Blair to execute a contract for sale, back-dated to June 25, i.e., dated the day before Cochran told Scoggins the property was sold. At the same meeting the sale was closed, with Mrs. Blair unaware of the Forbuses' interest in purchasing the property for $85,000.
On June 28, Mary Forbus went to City Realty to confront Cochran. By this time, Mary had learned of the $70,000 sale price. She testified:
 "I said, 'Martha, why did you buy the Blair house for $70,000 when you knew that Amanda was working with me for $85,000.' It was just — she never made a complete sentence, she just said something about *Page 1043 
'urgency'. . . . And she asked me, why did I think she paid $70,000 for the house, and I said, 'Martha, I know exactly what you paid for the house.' I said, 'We have talked with the [Blair] family and I know all the details of it; I know what you paid for the house.' And she said, 'Wait a minute and let me call [my husband] Harold over here. . . .'
 "Well at first, Harold and I were just chit-chatting. . . . [Then] I asked Martha again why did she buy the house for $70,000 and didn't let me resubmit an offer of $85,000. I said, 'In fact, the family told us that they never received an offer of $85,000 from us; they never received the first offer.' And Harold got kind of upset and he said I was accusing his wife of unethical behavior."
According to Mary Forbus, she told Cochran that Cochran should remedy the situation by selling the Blair house to the Forbuses for what Cochran paid for it. Mary Forbus testified that Cochran promised to get back in touch with the Forbuses on the subject and indicated that she was leaving for Europe and did not then have time to discuss it further.
The Forbuses did not hear back from Cochran. Later they sued Cochran and City Realty, alleging several fraud theories. The Forbuses sought both compensatory and punitive damages.
Thereafter, City Realty's "errors and omissions" insurer, CNA, brought a declaratory judgment action against the Forbuses and City Realty. CNA sought to determine whether its policy with City Realty would cover the acts alleged by the Forbuses. CNA asserted that City Realty did not have coverage for "expected or intended" acts.
 Directed Verdict or J.N.O.V. on Proximate Cause
In the Forbus fraud trial, a jury awarded the Forbuses $300,000 in unspecified damages. The case had been submitted to the jury after Cochran and City Realty moved for and were denied a directed verdict.
"Motions for directed verdict and j.n.o.v. both test the sufficiency of the evidence and are reviewed under the same standard." Green Tree Acceptance, Inc. v. Standridge,565 So.2d 38, 44 (Ala. 1990). To withstand a defendant's motion for directed verdict, i.e., in order for a plaintiff's claims to be submitted to a jury, the plaintiff must have presented "substantial evidence" in support of each element of his or her claims. General Motors Acceptance Corp. v. Covington,586 So.2d 178, 181 (Ala. 1991). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989).
A critical element of a fraud claim is that the plaintiff's damage or loss was a "proximate result of the alleged misrepresentation." Green Tree Acceptance, 565 So.2d at 42. City Realty and Cochran argue that there was no substantial evidence that the Forbuses were damaged as a proximate result of Cochran's actions, because, they say, the Forbuses had had the opportunity to buy the Blair property on June 25 and had lost that opportunity through their own failure to act.
Accordingly, say Cochran and City Realty, the trial court erred in denying their motion for a directed verdict at trial and later in denying them a j.n.o.v.
In simple terms, the evidence indicates that Cochran bought her client's property at approximately $20,000 below market value, and $15,000 below the price the clients of another agent were willing to pay. The evidence further discloses that at the time of the Forbuses' $85,000 offer, there was no contract for sale pending.[3] Cochran admits that she told Scoggins she had a "contract pending."
Cochran admitted that on June 26, when Mary Forbus met with Scoggins to look at the house again, Cochran told Scoggins that the house was "sold"; she told her this when *Page 1044 
Scoggins came by City Realty for the Blair house key. The evidence is unrefuted that the property was not in fact "sold" at that time.
It is also unrefuted that the Forbuses failed to make an offer on June 25, as Cochran and City Realty assert (in arguing that the Forbuses missed their "last chance" to buy the property). However, to suggest that this fact is significant is to overlook the fact that the Forbuses actually could have made an offer up to June 27, but understood differently because their agent, Scoggins, had been told by Cochran on June 26 that the Blair property was "sold." The property was not actually sold until June 27, nor was there any contract for sale until that date. On June 27 Cochran first presented Mrs. Blair with her offer in the form of a proposed contract for sale (which was back-dated to June 25), for Mrs. Blair to execute as the contract of the parties.
Stated differently, the evidence indicates that the Forbuses' purported "missed opportunity" on June 25 was not actually a "last chance"; thus, their missing that opportunity did not result in loss to them through their own fault, as the defendants contend. There is considerable evidence that the Forbuses actually missed their "last chance" to buy the Blair property because Scoggins, at Cochran's direction, told Mary Forbus on June 26 that the Blair property was "sold." In truth, the Forbuses could have acted on June 26 had they not believed the property had been sold.
Equally important, the evidence indicates that had it not been for the Cochran's failure to advise Mrs. Blair of the Forbuses' willingness to pay $85,000 when that willingness was first related to her by Scoggins, the Forbuses would not have been in an "urgent" situation on June 25. Mrs. Blair testified, without objection, that she would have accepted an $85,000 offer had it been relayed to her by Cochran.
Based on the foregoing, we are unpersuaded by Cochran and City Realty's argument that the Forbuses caused their own loss of the Blair property through their inaction on June 25.[4]
 Damages Awarded
We now turn to the correctness of the damages awarded. Before we can address the arguments of the parties in this respect, however, we must examine a problem that also confronted the trial court. The jury's verdict was an undesignated award of $300,000. We do not know precisely the elements of that award.
The jury's verdict was consistent with the form the trial court directed it to use. This form gave the jury only two options, to find an amount for the plaintiff or to find for the defendant. This form was defective in that it did not permit the jury to state a finding for both the plaintiff and the defendant, e.g., for *Page 1045 
the plaintiff as to compensatory damages, and for the defendant as to punitive damages, and it was defective as unresponsive to the issues at trial. For example, absent some specific jury determination as to punitive damages, the matter of Cochran's culpability remains unresolved.
Rule 49, Ala.R.Civ.P., "leaves it completely in the discretion of the court whether to direct a jury to return a general verdict, a general verdict accompanied by answers to interrogatories, or special verdicts." Committee Comments to Rule 49. Whatever form the verdict takes, however, it must respond to the dispositive factual questions posed by the issues at trial. "The law does not require any particular form in which a verdict must be rendered so long as it responds substantially to the issues raised." Whitmore v. First CityNat'l Bank of Oxford, 369 So.2d 517, 521 (Ala. 1979).
Because of the inherent flaws in the jury verdict form, which limited the jury's response, there is no way for this Court to know what part of the award was for compensatory damages and what part, if any, was for punitive damages.
Confronted with this problem, the trial court held that the jury could not have properly found compensatory damages in excess of $5,000. Then, based on that determination, it concluded that all other damages awarded by the jury must have been punitive damages. The trial court then found that $295,000 in punitive damages ($300,000 minus $5,000 compensatory damages) was excessive.
The Forbuses argue that it was "pure speculation" for the trial court "to designate what portion of the verdict was compensatory and what portion was punitive." We agree. Who can say with certainty that the jury did not award, for example, $300,000 in compensatory damages, meaning, under the trial court's reasoning, that a remittitur of $295,000 would have been in order. We do not suggest that this was the case. To the contrary, we suggest that any such calculations are speculative and improper. "[A] court's right to amend a jury verdict after discharge of the jury is limited to matters of form or clerical errors that are apparent from the record. . . ." Alabama FarmBureau Mut. Cas. Ins. Co. v. Williams, 530 So.2d 1371, 1377
(Ala. 1988). A court's authority to amend a verdict after the jury has been discharged cannot extend to matters of substance that a jury must determine. Id.; Alexiou v. Christu, 285 Ala. 346, 232 So.2d 595 (1970).
Therefore, we hold that the trial court erred in its post-trial order. The trial court improperly apportioned the jury award into punitive and compensatory damages, and, based on that improper action, erred in ordering a remittitur of punitive damages. We reinstate the jury's verdict.
Having reinstated the jury's verdict, we must consider how we are to review it. How can we consider whether the amount of the jury award is excessive when we cannot know what that amount represents?
The Forbuses argue that the $300,000 verdict would be supported in any event, claiming that the award was supported by proof on the question of compensatory damages alone. If the jury verdict of $300,000 would have been supported by the evidence in any event, then our inability to review it in terms of specific punitive damages or compensatory damages would be of no meaningful consequence. So too, it would be harmless error that the trial court failed to comply with Ala. Code 1975, § 6-11-1 (Supp. 1988), which provides:
 "In any civil action based upon tort . . ., except actions for wrongful death . . ., the damages assessed by the factfinder shall be itemized as follows:
"(1) Past damages
"(2) Future damages
"(3) Punitive damages"[5]
Although we would hold that some $300,000 combinations of compensatory damages and punitive damages would be supported by the evidence in this case, we would hold, for example, that an award of $300,000 compensatory *Page 1046 
damages — which the jury might have intended as its award — would not be supported by the evidence. We reject the Forbuses' arguments to the contrary.
Obviously, in this situation a remand for further proceedings would seem the answer. However, to justify a remand, should there not have been an objection to the court's action regarding the verdict form? Not only was there no such objection in this case, it appears that the Forbuses, Cochran, and City Realty agreed to the form of the verdict. Perhaps for tactical reasons,[6] these parties agreed with the trial court that it solicit a verdict either wholly in favor of the plaintiff, with a lump sum award, or wholly in favor of the defendants:
 "[Attorney for the plaintiffs]: Judge, before you bring the jury in, we would like to submit to the court our verdict forms dealing with compensatory and punitive damages.
"Court: Let me have them.
 "[Attorney for the defendants]: Let me say for the record, I won't ask what the court is interested in, but I will say for the record that the defendants respectfully request the court to submit the case to the jury for a general verdict.
 "[Attorney for the plaintiffs]: Your Honor, based on that request, . . . we withdraw our requested jury verdict forms.
 "Court: In that case, the court proposes to charge the jury as to rendering a general verdict either for or against the plaintiffs-defendants."
The parties then started discussing other matters with the court.
In Green Tree Acceptance, 565 So.2d at 38, we discussed the situation of unitemized verdicts and § 6-11-1. On appeal, the defendant in that case argued that the trial court's failure to use verdict forms itemizing compensatory and punitive damages, consistent with § 6-11-1, required a new trial. The defendant had not properly raised this issue in the trial court. We stated: "This Court will not put a trial court in error for failure to rule on a matter that, according to the record, was neither presented to nor decided by it." Id. at 46. We declined to remand the case on that ground for a new trial.
Here, no one objected to the verdict form and, in any event, we cannot properly remand this case for another jury to determine matters that were not determined in the first instance because of a situation the parties in the Forbus case agreed to. The economic and judicial resources of this state should not be so burdened.
In sum, we hold that the trial court erred in apportioning the verdict of $300,000 into compensatory and punitive damages. We do not disturb the $300,000 verdict. We cannot say whether it is right or wrong; we do not know what it represents, and it could be either right or wrong, i.e., either appropriate or excessive. We decline to remand this case for further determinations that would shed light on this issue, because the parties did not object to the undesignated verdict at trial. Thus, in case 1911687 we reverse the trial court's order of remittitur, and in case 1911599 we affirm the trial court's denial of a j.n.o.v.
 Insurance Coverage for the Award
In CNA's declaratory action, the trial court entered a summary judgment in favor of CNA, determining that Cochran and City Realty were not covered under the CNA policy for the $300,000 verdict. On appeal, Cochran and City Realty argue that the trial court misapplied the law to the facts. They say: "The issue here, unlike CNA would have this Court believe, is not whether City Realty's conduct was intentional ['expected or intended,' triggering an exclusion in coverage], but rather, whether City Realty intended the injury that their conduct allegedly caused." City Realty and Cochran quote United StatesFidelity Guar. Co. v. Armstrong, 479 So.2d 1164, 1167
(Ala. 1985), as that case interprets policy language excluding "expected or intended injury": "The insured *Page 1047 
must have possessed specific intent to inflict the damage to activate this policy exclusion." City Realty and Cochran say that the trial court misunderstood this standard and, in the absence of any evidence that Cochran acted with specific intent to cause damage or harm to the Forbuses, wrongly entered a judgment for CNA.
We are unpersuaded by Cochran and City Realty's arguments in this regard. There is evidence to indicate that Cochran acted with intent to inflict the harm on the Forbuses. However, we agree that the summary judgment was improper.
The summary judgment was based on the evidence from the Forbus trial. There were genuine issues of material fact at trial; the culpability of Cochran was an issue of material fact at trial, and it is an issue of considerable dispute here. Furthermore, a determination of Cochran's degree of culpability was not indicated by the jury's verdict.
A proper entry of summary judgment pre-supposes that there is "no genuine issue of material fact." Ala.R.Civ.P. 56(c). The evidence before the trial court on the summary judgment motion, that from the Forbus trial, created genuine issues of material fact. The summary judgment was improper, and the parties' arguments with respect to the ore tenus rule, a rule related to the adjudication of disputed facts, has no bearing. Therefore, in case 1911427 we reverse the summary judgment and remand for further proceedings consistent with this opinion.
1911687 REVERSED.
1911599 AFFIRMED.
1911427 REVERSED AND REMANDED.
In case 1911687, SHORES and ADAMS, JJ., concur; MADDOX, HOUSTON and INGRAM, JJ., concur in the result.
In case 1911599, MADDOX, SHORES, ADAMS, HOUSTON and INGRAM, JJ., concur.
In case 1911427, MADDOX, SHORES, ADAMS and HOUSTON, JJ., concur; INGRAM, J., dissents.
[1] In addition to being Mrs. Blair's listing agent, Cochran was also Scoggins's superior at City Realty.
[2] This $70,000 offer was apparently made before the Forbuses had decided to offer $85,000 through Scoggins.
[3] Accepting Cochran's testimony as true, one would conclude there was at most an oral understanding that Lawhorn would buy the property. An agreement to purchase land is "void unless such agreement . . . is in writing." Ala. Code 1975, § 8-9-2.
[4] As to the inferences of the evidence as to why Cochran did not initially relate the Forbuses' interest in purchasing the property for $85,000, the Forbuses state:
 "Evidently, Cochran had 'hopes' that interest shown by a Mr. Russell Lawhorn in late may 1990 might result in some future sale. Cochran realized that since Lawhorn was her 'prospect,' then she stood to receive the entire real estate commission.
 "Unexpectedly though, the Forbuses made a substantial offer of $85,000, during the first week of June 1990. . . . If the Forbuses' offer was communicated to [Mrs.] Blair and she accepted it then Cochran would have 'share' a portion of her commission with Amanda Scoggins."
What the Forbuses refer to is that generally a listing agent must share with the selling agent a portion of the total commission paid. When the listing agent sells the property he or she has listed, i.e., when the listing agent is also the selling agent, this greatly increases his or her share of the commission. He or she then receives both a listing agent's share and a selling agent's share.
We need not determine whether the evidence at trial reasonably suggests the motive advanced by the Forbuses for Cochran's initial failure to disclose their interest in purchasing the Blair property for $85,000. However, we note the perilous position a listing agent assumes in a situation where he or she is seen to have discouraged a seller he or she represents, from accepting another agent's offer, while promoting a less advantageous offer that the listing agent has obtained. We agree with the Forbuses that there is an inference of improper motivation in such a situation. It appears in that situation that the listing agent is attempting to increase his or her commission to the detriment of the seller, the thwarted potential buyer, and that buyer's agent.
[5] Another unrelated provision of § 6-11-1 has been declared unconstitutional. See Clark v. Container Corp. of America,Inc., 589 So.2d 184, 198 (Ala. 1991).
[6] For example, it is argued that whether Cochran and City Realty are insured for the Forbus award turns on whether the jury found intentional fraud. The type of fraud that the jury found was not indicated in its verdict, a fact that Cochran and City Realty use to buttress their argument in the CNA declaratory judgment appeal that they are covered under their CNA policy.