703 So.2d 917 (1997)
TALENT TREE PERSONNEL SERVICES, INC., and Brenda Harris
v.
Cathy FLEENOR.
Cathy FLEENOR
v.
TALENT TREE PERSONNEL SERVICES, INC., and Brenda Harris.
1951954, 1952087.
Supreme Court of Alabama.
September 12, 1997.
*918 David B. Anderson and Julia Boaz-Cooper of Walston, Stabler, Wells, Anderson & Bains, Birmingham; and Stephen Wagner of Gratch, Jacobs & Brozman, P.C., New York City, for appellants/cross appellees.
Richard Jordan, Randy Myers, and Benjamin L. Locklar, Montgomery, for appellee/cross appellant.
SHORES, Justice.
Cathy Fleenor sued her employer, Talent Tree Personnel Services, Inc. (hereinafter "Talent Tree"), and the employer's office manager, Brenda Harris, for damages based on fraudulent misrepresentation and fraudulent suppression; she alleged that the defendants *919 had manipulated her quarterly sales figures in order to cheat her out of sales commissions. As to Talent Tree, she also alleged breach of contract. The jury found for Fleenor, awarding her $300,000 in compensatory damages and $3 million in punitive damages under the fraud counts; the trial court ordered a reduction of the punitive damages to $2 million. The defendants appeal from the resulting $2.3 million judgment. Fleenor appeals the trial court's order requiring a remittitur of the $3 million punitive damages award.
Talent Tree is an employment agency. It hires individuals and sells their services to purchasing companies for a flat fee. The fee enables Talent Tree to make a profit over the costs of paying the employees' salaries, benefits, workers' compensation insurance, federal withholding tax, etc. Harris was Talent Tree's market manager for the State of Alabama and was Fleenor's immediate supervisor. The two women worked together in the company's Birmingham office.
Fleenor began working for Talent Tree in 1992 as an account representative. In 1994, she earned commissions on her sales that exceeded a quarterly quota set by Talent Tree and that exceeded a profit margin of 20% (the difference between the costs to Talent Tree for the employees' salaries, etc., and the fee charged to the purchasing company). The amount of the commissions was calculated from her quarterly sales, her yearto-date sales, and her salary. Most of her compensation came from the commissions that she earned when she established enough new accounts to meet the quarterly sales quotas set by Talent Tree.
Fleenor excelled in her position. She became the number one salesperson for Talent Tree in Alabama. Following the first quarter of fiscal year 1994, she was paid a commission of $19,440 for that quarter. In the second quarter, she again did well, and for that quarter she received a commission of $27,229. She did not receive any information showing how the commissions for these two quarters were calculated, but she had no reason to doubt that she was receiving the total commissions owed her.
At the end of the third quarter, Fleenor's husband was transferred to Atlanta, Georgia, and she moved there with him. Around this time, Harris "promoted" Fleenor from account representative to account executive. An employee being promoted to account executive typically received a step-up in salary, but the employee's quota was also increased, so that the employee had to produce a higher volume of sales before Talent Tree would pay a commission. Fleenor, however, did not receive an increase in salary, and she protested the title change that raised her quota without any corresponding benefit to her. After completing the move to Atlanta, Fleenor telephoned Harris to check on the payment of her third-quarter commission. Her sales during the third-quarter had increased, and she expected her commission for the third quarter to exceed her commissions for either of the first two quarters. Brenda Harris told her that her third quarter commission would be approximately $4,000.
Suspecting that her third quarter commission was too low, Fleenor began requesting information from Talent Tree to support the commission figures. During this process, she expressed her concerns to her immediate supervisor, Harris; to Talent Tree's vice president of human resources, David Seaver; to a company clerk, Eva Chen; and to Talent Tree's chief executive officer, Manjit Singh. When Fleenor spoke with Seaver, he initially responded with the statement "[I]f you want to play games, we can play games." Fleenor persevered, and the documents that she began receiving showed that her sales figures had been reduced without her knowledge; that upper-level management of Talent Tree had merely crossed out some figures and replaced them arbitrarily with lower figures; that her commission calculations had been retroactively reduced by applying the higher quota requirements of an account executive; and that certain new accounts Fleenor had established either had not been credited to her commission calculation or had been removed from that calculation after the fact. The result was that Talent Tree had underpaid her commissions for each of the three quarters of 1994. Talent Tree admitted that it owed Fleenor some amount, at most $69,000. Fleenor claimed that Talent Tree owed *920 her about $186,000 as underpaid commissions for three quarters. After settlement negotiations failed, Fleenor sued.
The evidence produced during discovery showed that the Birmingham branch, during the period of the alleged misconduct, had incurred an uncollectible account receivable, for employee services provided to a business known as Psychiatric Day Care; that uncollectible account amounted to $1 million. Harris's husband worked at Psychiatric Day Care as its chief financial officer. He had arranged with Harris to purchase employee services from Talent Tree, including his own services. Essentially, Talent Tree paid Mr. Harris a salary of $300,000 a year to work at Psychiatric Day Care. The Talent Tree account representative in charge of the Psychiatric Day Care account, Vicki Self, testified that Brenda Harris did not tell her that the account was in arrears, in violation of Talent Tree's policy of putting the responsibility on the representative in charge of the account either to collect or to withdraw Talent Tree's employees after a delinquency period of 60 days. In October 1994, Vicki Self began trying to learn as much about the account as possible; on November 1, 1994, she was fired by Harris.
Harris earned commissions based on the profit or loss of her office. She testified that she had initially thought that paying a commission to Fleenor would reduce her own commission, because the expenses the office incurred from paying the commission, she thought, cut into the office's profit and thereby reduced her own commission. The uncollectible Psychiatric Day Care account, in combination with Harris's understanding of the method by which her commission was calculated, Fleenor argued, provided the motive behind the manipulation of her sales figures.
Talent Tree and Harris argued that the errors in Fleenor's commission payments occurred because of what they characterized as a cumbersome and complicated bonus plan. They alleged that the errors were innocent mistakes, and they denied that they had fraudulently suppressed the errors. At trial, however, counsel for the defendants stated that "in the second quarter there was a calculation that said her bonus will be $36,000." Counsel continued, "There were strikeouts that [plaintiff's counsel] showed you, and she was paid $27,000. And quite frankly, we can't figure out why."
The defendants argue: 1) The compensatory damages award of $0 for the breach of contract claim and the compensatory damages award of $300,000 on the fraud claim create an inconsistency in the jury verdict as a matter of law; 2) the trial court committed reversible error by admitting evidence of the Psychiatric Day Care account; 3) the compensatory damages award of $300,000 does not justify, by clear and convincing evidence, an award of punitive damages; and 4) the award of $2 million is unconstitutionally excessive.
The defendants argue that the jury's verdict is inconsistent as a matter of law. The jury awarded $0 on the breach of contract claim. They argue that because the jury awarded no damages under the contract claim, the jury did not find that Talent Tree had breached its contract with Fleenor. They argue that in order for Fleenor to recover under her fraud claims, the jury would have to find that Talent Tree breached its contract with her. The verdict, they argue, was therefore inconsistent as a matter of law and entitles them to a new trial. United States Fidelity & Guaranty Co. v. McKinnon, 356 So.2d 600 (Ala.1978).
The verdict form the jury selected, the closing arguments of the plaintiff's counsel, and the trial court's charge to the jury, however, do not support the defendants' argument. The verdict form read:
"We, the jury, find in favor of plaintiff, Cathy Fleenor, and against defendant(s),
"× Talent Tree Personnel Services, Inc.
"× Brenda Harris "and assess damages for fraud in the amount(s) as follows:
"Compensatory $300,000
"Punitive $3,000,000
"and assess damages for breach of contract against Talent Tree Personnel Services Inc. in the amount as follows:

*921 "Compensatory $0."
In explaining this verdict form to the jury, the plaintiff's counsel told the jury that, if the jury found for Fleenor, it would assign to the fraud count any award of compensatory damages:
"[The verdict form says] we, the jury, find in favor of the plaintiff, Cathy Fleenor, and against the defendants. You can check them off, Talent Tree or Brenda Harris or both. Now, and assess damages for the fraud in the amount as follows: Compensatory, which would be the out-ofpocket, the earnings as I call it. That's what it is. As well as mental anguish. All of that is compensatory.... Now and we further assess damages for breach of contract against Talent Tree Personnel Services in the amount as follows: Compensatory. We're entitled to interest on those wages, but we have agreed and stipulated with the Judge that we don't want to burden y'all down with trying to figure up the interest on that, when it starts and when it stops. He's going to do that based on whatever verdict you bring back on the out-of-pocket earnings in the case.
"There's no way for her to collect twice.... What you do is you arrive through your calculations with one judgment. That's all, just one judgment. It's either going to be against both of them or against just one of them...."
The trial court also charged the jury that it could assign to the fraud count an amount for compensatory damages that it found Talent Tree owed Fleenor:
"The plaintiff claim[s] compensation for the following items or elements of damages: Loss of earnings and mental anguish. "....
"... The fraud charge in this claim here, which [has] been described to you, is in reference to the amount of compensation which she allege[s] is due to her."
"[C]ourts do not favor the setting aside of verdicts for damages if it can be avoided...." Stinson v. Acme Propane Gas Co., 391 So.2d 659, 661 (Ala.1980). In Stinson, we rejected the argument that a verdict awarding no compensation to a prevailing party is, in fact, a verdict for the defendant. Stinson, 391 So.2d at 660. Accordingly, we reject the defendants' argument that the jury's award of no compensation under the contract count means that the jury did not find that Talent Tree had breached its contract with Fleenor. Based on the verdict form, the argument of plaintiff's counsel, and the trial court's charge, we conclude that the jury awarded compensatory damages, including the amount of the commissions Talent Tree admitted at trial it owed Fleenor, and put the amount in the space for compensatory damages under the fraud count. Heeding the warning by plaintiff's counsel, the jury put the compensatory award under the fraud count out of an abundance of caution, in order to avoid awarding a double recovery. See Deupree v. Butner, 522 So.2d 242 (Ala. 1988). The jury's verdict was consistent with the trial court's charge and was consistent with the jury's determination as to liability. Moreover, we are not inclined to remand this case for another jury to determine matters that were not determined in the first instance because of a situation that the parties agreed to; namely, the use of this verdict form. City Realty, Inc. v. Continental Casualty Co., 623 So.2d 1039 (Ala.1993); E & S Facilities, Inc. v. Precision Chipper Corp., 565 So.2d 54 (Ala.1990).
The defendants next argue that the trial court committed reversible error by allowing the introduction of what the defendants consider prejudicial evidence concerning the Psychiatric Day Care account. Specifically, they argue that Harris had no motive to defraud Fleenor; that the evidence concerning Psychiatric Day Care was irrelevant and inflammatory; and that it was used to create bias against Harris by portraying her as a "bad character."
In Associates Financial Services Co. v. Barbour, 592 So.2d 191, 196 (Ala.1991),[1] we *922 addressed the limits of admissible evidence in fraud cases:
"In HealthAmerica v. Menton, 551 So.2d 235, 245 (Ala.1989), we held that `in fraud actions, great latitude is allowed in the scope of evidence introduced.... Questions of materiality, relevance, and remoteness of evidence are matters resting within the discretion of the trial court, whose exercise of that discretion will not be reversed unless it has been grossly abused.' In Ex Parte Georgia Cas. & Surety Co., 531 So.2d 838 (Ala.1988), we held that evidence of similar fraudulent acts was admissible to prove an alleged fraudulent scheme. In White, we cited Great American Ins. Co. v. Dover, 221 Ala. 612, 130 So. 335 (1930), in which this Court stated that `evidence of fraudulent transactions by the same party and substantially of the same character, contemporaneous in point of time, or nearly so, is admissible to show fraud in respect to a matter wholly distinct from the previous transaction.'"
The trial court considered a motion in limine on this issue. After listening to the arguments of both parties, it ruled that the evidence concerning the Psychiatric Day Care account, including evidence of Don Harris's salary and of his relationship with Brenda Harris, was admissible to show a motive to defraud on the part of Brenda Harris and Talent Tree. The record showed that after a few months Psychiatric Day Care owed Talent Tree more than $1 million, which was the largest debt ever owed to the Birmingham office; that Talent Tree would typically shut down an account after it had been in arrears more than 60 days; and that Harris was paying her husband a salary of $300,000 a year. Harris admitted on cross-examination that the Psychiatric Day Care account would affect the commissions of her staff and, to her knowledge, would have a negative impact on her bonus. When this evidence was offered, Talent Tree and Harris did not object to most of it. We conclude that this evidence was admissible to show a motive for defrauding Fleenor and that it did not exceed the wide scope of admissibility that is applicable in fraud actions. Accordingly, the trial court did not abuse its discretion by admitting this evidence.
Next, the defendants argue that the compensatory damages award of $300,000 on the fraud claim is grossly excessive, because, they contend, the award is composed only of damages for mental anguish. The record, on the other hand, clearly refutes that contention. Fleenor presented evidence that Talent Tree and Harris had underpaid her by as much as $186,000. Talent Tree and Harris admitted at trial that Fleenor is owed some amount, which they admitted could have been as much as $69,000.
In Duck Head Apparel Co. v. Hoots, 659 So.2d 897, 907 (Ala.1995), we quoted the postjudgment order of the trial court as a statement of the applicable law:
"`When assessing the question of excessiveness of compensatory damages, the focus is on the Plaintiff, as stated in Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993):
"`"A court reviewing a verdict for compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. Bridges v. Clements, 580 So.2d 1346, 1349 (Ala. 1991)."
"`There is no fixed standard for ascertainment of compensatory damages for mental anguish. A determination of how much to award is left to the sound discretion of the jury, subject only to the correction of the Court for clear abuse or passionate exercise. Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975).'"
In Pitt v. Century II, Inc., 631 So.2d 235, 240 (Ala.1993), we held:

*923 "When there is no evidence before the court of any misconduct, bias, passion, prejudice, corruption, improper motive, or cause not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages. Northeast Alabama Regional Medical Center v. Owens, 584 So.2d 1360, 1366 (Ala.1991)."
Here, the jury awarded the plaintiff a total of $300,000 for compensatory damages. The award included the actual amounts owed to Fleenor for the commissions the defendants had wrongfully withheld and also included an amount for mental anguish. Fleenor testified that the anguish she had suffered as a result of the defendants' conduct had interfered with her relationship with her husband and her son. She testified that the ordeal had uncontrollably absorbed her thoughts; had brought her to tears on several occasions; had disturbed her life generally and her ability to sleep, specifically; and had thoroughly upset her during the course of discovery as the evidence of the defendants' fraud was brought to light. She testified that she had become furious with Talent Tree because she felt that she had been cheated after working diligently to become the number one salesperson in Alabama. She testified that after working a year to earn the money she "had to work another year just to try to collect it." She testified that the resulting stress and strain she had endured had made it difficult for her to control her emotions. We conclude that there is substantial evidence in the record to support the jury's award of compensatory damages.[2]
Next, the defendants argue that the jury could not have found by clear and convincing evidence that an award of punitive damages was justified, because, they contend, the record shows that the nondisclosure in this case was not gross, oppressive, or malicious and was not committed with the intention of depriving Fleenor of her property. Ex parte Norwood Hodges Motor Co., 680 So.2d 245 (Ala.1996). We must determine whether the jury could have found by clear and convincing evidence that the defendants' conduct amounted to
"[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury."
§ 6-11-20(b)(1), Ala.Code 1975. This Court will not disturb a jury verdict on the ground of insufficiency of the evidence unless it appears that the verdict was plainly and palpably wrong and unjust. Gold Kist, Inc. v. Griffin, 657 So.2d 826 (Ala.1994).
"Clear and convincing evidence," for purposes of punitive damages awards, is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4), Ala.Code 1975. The "clear and convincing standard" is a higher standard than a "preponderance of the evidence" standard or a "substantial weight of the evidence" standard, but it is lower than the criminal standard, which requires proof "beyond a reasonable doubt." Id. "Malice" is defined as "[t]he intentional doing of a wrongful act without just cause or excuse, either: a. With an intent to injure the *924 person or property of another person ..., or b. Under such circumstances that the law will imply an evil intent." § 6-11-20(b)(2), Ala. Code 1975. "Oppression" is defined as "[s]ubjecting a person to cruel and unjust hardship in conscious disregard of that person's rights." § 6-11-20(b)(5). "Gross" is defined as inexcusable, flagrant, or shameful. Ex parte Norwood Hodges Motor Co., 680 So.2d at 249.
The evidence showed that the defendants had retroactively applied a method that reduced the plaintiff's commissions, without her knowledge. Not only were Fleenor's commissions reduced; numbers on her quarterly sales reports were arbitrarily struck out and replaced with lower numbers. Manjit Singh, the chief executive officer of Talent Tree, testified:
"Q: Right. Well, you looked at what your company had done?
"A: Yes.
"Q: And you saw that there was $36,000 that your company, at one point in time, had said that they owed Mrs. Fleenor as to second quarter?
"A: That is correct.
"Q: And that was even after raising her quota?
"A: That is correct.
"Q: And that was after taking out Pope Industries?
"A: That is correct.
"Q: All right. And then you saw where they came here and just slashed out that number and put $27,000?
"A: That is correct."
The defendants admit that they did not pay Fleenor the full amounts Talent Tree owed her for commissions for the three quarters of 1994. We conclude that the jury could have found, by clear and convincing evidence, that the defendants acted with the malicious intent or gross conduct required to justify the imposition of punitive damages.
The defendants' final argument is that the award of $2 million in punitive damages is unconstitutionally excessive in light of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and in light of this Court's precedent. In BMW, the Supreme Court of the United States emphasized that state courts must provide a "meaningful" judicial review of a punitive damages award, when such an award is challenged by a tortfeasor as excessive, to ensure that the tortfeasor's right to due process of law is not violated. See BMW, 517 U.S. at 564, 587, 116 S.Ct. at 1593, 1605 (Breyer, J., concurring), on remand, 701 So.2d 507, 510 (Ala.1997). The Supreme Court stated that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose" for such conduct. BMW, 517 U.S. at 574, 116 S.Ct. at 1598. The Court utilized three "guideposts" to conclude that BMW had not received adequate notice of the magnitude of the sanction that Alabama might impose for BMW's nondisclosure policy. BMW, 517 U.S. at 574-75, 116 S.Ct. at 1598-99. The three guideposts are: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the amount of actual or potential harm suffered by the plaintiff, and (3) a comparison of the amount of the jury's verdict with civil or criminal penalties (if any) that could be imposed under the law for comparable misconduct.[3]BMW, 517 U.S. at 574-84, 116 S.Ct. at 1598-1603. The BMW Court concluded that the $2 million award was "grossly excessive" in light of the low level of reprehensibility of BMW's conduct; in light of the 500:1 ratio between the punitive award and the actual harm to the plaintiff, Dr. Ira Gore, Jr., who had purchased the repainted BMW automobile; and in light of the statutory fines available in Alabama and elsewhere for similar malfeasance. BMW, 517 U.S. at 574-76, *925 579-83, 116 S.Ct. at 1598-99, 1601-03. The BMW case came to this Court on remand, and this Court discussed these guideposts in its remand opinion  BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II").
In discussing the first guidepost, the United States Supreme Court called the degree of reprehensibility "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW, 517 U.S. at 575, 116 S.Ct. at 1599. Given the importance of this guidepost, courts must consider what evidence, taken in a light most favorable to the plaintiff,[4] would have permitted the jury to find that the amount of the punitive damages award accurately reflected the "enormity of the offense." See BMW, 517 U.S. at 575, 116 S.Ct. at 1599. Mitigating factors are important to this determination, as are aggravating factors.
Reprehensibility of the defendant's conduct is one of the factors that Alabama courts consider in the common law excessiveness review required by Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). As stated by this Court in Green Oil, considerations applicable to determining reprehensibility include the duration of the conduct; the degree of the defendant's awareness of any hazard that his conduct was causing or was likely to cause; and any concealment or "cover up" of the hazards created. 539 So.2d at 223. An Alabama statute adds these considerations: whether the defendant has been guilty of similar acts in the past; the nature and extent of efforts on the part of the defendant to remedy the wrong; and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong. § 6-11-23(b), Ala.Code 1975. In BMW II, we noted that, to these factors, the Supreme Court in BMW added two others that principally determine reprehensibility: (1) the defendant's awareness of his acts or omissions causing harm and (2) the quality and quantity of rights of others that were disregarded by the defendant. See BMW II, supra, 701 So.2d at 512. Repeated misconduct is more reprehensible than a single instance of misconduct, and, as recognized by the Supreme Court in BMW, some tortious conduct is more blameworthy than other tortious conduct. 517 U.S. at 576-77, 116 S.Ct. at 1599-1600.
The trial court reviewed the evidence and stated:
"The plaintiff introduced evidence that indicated that her bonus for a period was reduced for which [reduction] Talent Tree never informed her and had no adequate explanation even at trial. She also produced evidence that indicated a retroactive reduction in commissions without notice to her. For their part the Defendants produced evidence that Defendant, Brenda Harris, interceded on behalf of plaintiff to get plaintiff a lower quota in order to increase Fleenor's income and that upon Fleenor's complaint to the home office that they attempted to resolve the complaint even to the extent of hiring an outside accountant. Talent Tree also claimed that they voluntarily in good faith gave Fleenor all available documents.
"While the amount is disputed, Talent Tree acknowledges that they owe Fleenor some amount.
"....
"... The defendants also deny that they suppressed or `covered up' their alleged fraudulent acts. It is found that the jury had sufficient evidence to support its finding. It was not argued that the verdict would have an overly substantial impact on Talent Tree and there is no indication that Harris will have to pay any portion of the judgment and she has not been discharged or disciplined. There is no evidence that this case impacted on innocent third parties. There are no criminal sanctions or other civil actions pending. The Defendants' conduct lasted a few months; however, the Plaintiff was required to go through the litigation process with its time and cost requirements.
"In considering the foregoing, the Court concludes and finds that evidence supports *926 that Fleenor was paid less than she was contractually due in some amount and that Talent Tree changed the compensation amount without explanation, notice or justification. The Court further finds that evidence supports the jury's verdict.
"....
"Upon consideration of the foregoing ... the verdict of $3,000,000.00 is more than necessary to accomplish society's goal of punishing the Defendants and deterring others from such conduct. Considering the size of the Defendant Corporation and that this judgment would sting but certainly not destroy,[[5]] the Court ... Orders a remittitur ... to $2,000,000...."
So far as we are aware, no other action, civil or criminal, has been taken against the defendants for their misconduct, and there is no evidence of prior misconduct. The malfeasance in this case lasted about three months. Upon its discovery, the defendants began to respond in a timely manner to Fleenor's requests for information. As indicated by the trial court, Talent Tree provided most of the relevant documents when Fleenor initially asked for them. One document, however, showed that her sales figures had been inexplicably struck out and replaced with lower figures. This document was not produced until a month before trial. When negotiations broke down, Talent Tree offered to hire an independent analyst. Because Fleenor strongly disagreed with the amount offered by Talent Tree, she was forced to sue.
Fleenor also gave the defendants a reasonable opportunity to remedy the misconduct, especially considering the sensitive nature of the case. David Seaver first scorned her allegations by saying, "If you want to play games, we can play games." In due course, the president of the company was made fully aware of the problems, including the fact that Talent Tree owed Fleenor some amount.
Because this case was mostly an argument over money, the rights affected were largely economic in nature; but this characterization is not meant to belittle the injury. Additionally, during the course of trial and on appeal, Talent Tree has accused Fleenor of committing fraud, of padding her sales figures, and of manipulating her accounts. Based on those accusations, Talent Tree has argued that Fleenor actually owes it money, although at the same time it admits that it owes her money.
In conclusion, Fleenor's commissions were retroactively reduced for a three-month period without her knowledge. The misconduct was undisclosed and was deliberately aimed at manipulating Fleenor's sales figures and her accounts in order to reduce the amount that Talent would pay her for commissions. This affirmative misconduct amounts to concealment and is evidence of an improper motive. See Duck Head Apparel Co., supra; BMW II, supra (Houston, J., concurring in the result). As stated by the United States Supreme Court in BMW, 517 U.S. at 576, 116 S.Ct. at 1599:
"[The] infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, ... can warrant a substantial penalty....
"... Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law."
The record fully supports the trial court's findings that the defendants' activities were not merely the result of accidents and mistakes and that the defendants were simply unable to answer the evidence of wrongdoing. Duck Head Apparel Co., 659 So.2d at 914. Additionally, when Fleenor first questioned the accuracy of the commission payments Talent Tree had made to her, she received most, but not all, of the documents necessary to reveal the misconduct. Contrary to Talent Tree's assertion that such information was made available as soon as she asked for it, Fleenor instead was forced to invoke the discovery provisions of the Alabama Rules of Civil Procedure before she could get the most important document necessary to establishing her claim.
*927 The Supreme Court stated in BMW that the "perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff" and noted the principle "that exemplary damages must bear a `reasonable relationship' to compensatory damages." 517 U.S. at 580, 116 S.Ct. at 1601. The Supreme Court expressly stated that due process does not require a purely mathematical formula and that in most cases, a remittitur will not be justified on the basis of the ratio. 517 U.S. at 582-83, 116 S.Ct. at 1602-03. However, "a high ratio might indicate excessiveness, particularly if the conduct of the defendant was not especially reprehensible." BMW II, 701 So.2d at 513. We are today ordering a further reduction of the amount of $2 million to $1.5 million. We conclude that an award of $1.5 million in punitive damages is not excessive, is not unreasonable in relation to the compensatory damages awarded, and is reasonable under the circumstances of this case.[6]
Last, in BMW the Supreme Court announced that state courts, when reviewing punitive damages awards for excessiveness, must "compar[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." BMW, 517 U.S. at 583, 116 S.Ct. at 1603. The aim of this endeavor is to "`accord "substantial deference" to legislative judgments concerning the appropriate sanctions for the conduct at issue.'" 517 U.S. at 583, 116 S.Ct. at 1603 (citations omitted).
Alabama citizens who become victims of fraud in employment situations such as this have little recourse other than private litigation. Punitive damages have historically been part of the remedy for such victims of fraud. See Duck Head Apparel Co., supra. As to criminal penalties, theft by deception of more than $1,000 is a Class B felony, punishable by 2 to 20 years' imprisonment. § 13A 8-3, Ala.Code 1975. In comparing the verdict in this case to the criminal sanctions that might be imposed under the facts, we cannot say that $1.5 million in punitive damages exceeds the outer limits imposed by the Due Process Clause of the Constitution.
Having independently reviewed the evidence in this case in light of BMW, we now consider specifically the additional factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989), cited in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and quoted in Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d 384 (Ala. 1993), which are not addressed by the Supreme Court in BMW:
"`(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; ... (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the `financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.'

"Haslip, 499 U.S. at 21-22, 111 S.Ct. at 1045."
Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d at 394.
First, we consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." As stated earlier in this opinion, it is likely that Fleenor's mental suffering will strain her future *928 relationships with employers. Her relationship with her family may also have suffered lasting setbacks. Talent Tree's conduct showed an indifference to, and a reckless disregard for, her economic rights, and Talent Tree breached her trust. Talent Tree admitted that it owes Fleenor as much as $69,000. Alabama, by statute, provides that theft by deception of more than $1,000 is punishable by 2 to 20 years' imprisonment. Consequently, the award of $1.5 million in punitive damages has a reasonable relationship to the harm that occurred and that was likely to occur. Clearly, the defendant stood to profit from its wrongful conduct. The verdict, even without the remittitur in the trial court, would have little or no impact on Talent Tree, by admission of its own corporate officers. Additionally, any award in this case will have no impact whatever on Harris, because Talent Tree has paid all of her legal expenses and will pay the full amount of the judgment. As indicated previously, the defendants have not been criminally sanctioned for their misconduct, nor are we aware of any other civil awards against the defendants for the same conduct.
Having examined the record in this case and reviewed the verdict for excessiveness under our established standards, plus the additional factors required by the Supreme Court in BMW, we conclude that a $1.5 million punitive damages award does not exceed the outer limit permissible under the Due Process Clause of the United States Constitution or the limit permissible under Alabama law. Accordingly, the judgment of the trial court is affirmed, conditioned upon the plaintiff's accepting a further reduction of the punitive award to $1.5 million. If the plaintiff does not, within 28 days of the date of this opinion, file in this Court a remittitur of punitive damages to the sum of $1.5 million, then the defendants shall be granted a new trial.
In view of this disposition of the case, we need not address the cross appeal.
AFFIRMED CONDITIONALLY.[*]
ALMON, KENNEDY, and COOK, JJ., concur.
HOUSTON, J., concurs specially.
MADDOX and BUTTS, JJ., concur in the result.
HOOPER, C.J., concurs in part and dissents in part.
HOUSTON, Justice (concurring specially).
If I adhered to my concurrence in the result in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) (BMW II), I would vote to approve a punitive damages award of no more than $900,000. However, the majority opinion in BMW II, and not my concurrence in the result, is the law of the State of Alabama; therefore, I concur in the judgment approving a punitive damages award of $1.5 million.
HOOPER, Chief Justice (concurring in part and dissenting in part).
I believe that the punitive damages award, even as reduced by this Court, is excessive. For this reason, I must respectfully dissent as to the punitive damages award. A jury awarded Ms. Fleenor $300,000 in compensatory damages. I concur in the affirmance of this compensatory award. I believe that any punitive damages award in excess of $1 million, however, is a violation of the defendant's right to due process.
NOTES
[1] Accord, Potomac Leasing Co. v. Bulger, 531 So.2d 307, 310 (Ala.1988) ("`In passing upon the admissibility of such collateral matters, great latitude must be extended so as to afford the admission of any relevant evidence bearing upon the ultimate issue of fraud.'") (quoting Dorcal, Inc. v. Xerox Corp., 398 So.2d 665, 671 (Ala.1981)); Valentine v. World Omni Leasing, Inc., 601 So.2d 1006, 1009 (Ala.Civ.App.1992) ("The commission of similar wrongs by a party to civil actions has been allowed to prove knowledge, design, intent, motive, malice and wantonness to show a fraudulent intent, plan or scheme."); Old Southern Life Ins. Co. v. Roberts, 290 Ala. 8, 272 So.2d 891 (1972) (holding that proof of a person's motive is admissible even though such proof is weak and inconclusive).
[2] Fleenor, in describing her mental anguish, testified:

"[I]t's just escalated throughout. I've had such stress on me and the negative emotions that I've experienced, like anger, disillusionment, disappointment. I've spent a lot of time crying, and I've had trouble controlling my emotions. I spent a lot of time having trouble sleeping at night. I just can't turn this off. I just keep thinking about it, and it's very upsetting. And the more that I discover, the more upsetting it's become, because they're now contending that I didn't sell the accounts that I sold. And Brenda Harris is taking credit for selling a lot of my accounts. And I worked very hard under this program, and I was very motivated by the potential.... I worked very hard in 1994 for it, and now I've had to work another year just to try to collect it. And I've had to hire attorneys to do this.... I was so preoccupied with all of this and in trying to get these numbers together that I really  my whole family has suffered.... It's been very disruptive to my life...."
[3] The review should also ensure that the jury's verdict was focused on "the State's interest in protecting its own consumers and its own economy," rather than those of other states or those of the entire nation. BMW, 517 U.S. at 571, 116 S.Ct. at 1597. We note that Fleenor's case does not present any of the concerns of state sovereignty, comity, or interstate commerce addressed by the United States Supreme Court in BMW.
[4] King Motor Co. v. Wilson, 612 So.2d 1153 (Ala. 1992).
[5] During trial, the defendants made no issue about the impact of the verdict on Talent Tree.
[6] The reasonableness of the 5:1 ratio is further supported by the ratios in cases in which the United States Supreme Court denied certiorari review within a short time after it released its BMW decision. See Liberty Mutual Ins. Co. v. Chemstar, Inc., ___ U.S. ___, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996) (5:1 ratio); Wolfberg v. Greenberg, ___ U.S. ___, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996) (8:1 ratio); Murray v. Laborers Union Local No. 324, 55 F.3d 1445 (9th Cir.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996) (800:1 ratio); Fraidin v. Weitzman, 93 Md.App. 168, 611 A.2d 1046 (1991), cert. denied, 329 Md. 109, 617 A.2d 1055 (1993), ___ U.S. ___, 116 S.Ct. 1846, 134 L.Ed2d 948 (1996) (15:1 ratio).
[*] Note from the reporter of decisions: The Supreme Court on October 6, 1997, entered a "certificate of Judgment of affirmance," noting that "the appellee/cross appellant, Cathy Fleenor, did on September 22, 1997, file in this Court a remittitur reducing the punitive damages to $1,500,000." The certificate ordered "that the judgment of the circuit court for punitive damages be reduced to $1,500,000 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs."