792 So.2d 351 (2000)
NEW PLAN REALTY TRUST and New Plan Realty Trust of Alabama, Inc., d/b/a The Club Apartments
v.
Kimberly MORGAN.
1981944.
Supreme Court of Alabama.
December 29, 2000.
Rehearing Denied February 23, 2001.
*354 James S. Ward and Adam P. Morel of Corley, Moncus & Ward, P.C., Birmingham, for appellant.
Kenneth Lee Cleveland of Cleveland & Cleveland, P.C., Birmingham, for appellee.

On Application for Rehearing
JOHNSTONE, Justice.
The opinion of May 12, 2000, is withdrawn, and the following opinion is substituted therefor.
This case arises from the removal and disposition of personal belongings from an apartment before the termination of the lease. Kimberly Morgan sued New Plan Realty Trust and New Plan Realty Trust of Alabama, Inc., d/b/a The Club Apartments (collectively "New Plan") for trespass and conversion because New Plan removed and disposed of her belongings from her apartment before the end of her lease. After a trial, the jury returned a verdict in favor of Morgan and against New Plan. The jury awarded Morgan $100,000 in compensatory damages and $100,000 in punitive damages.
New Plan appeals and asserts that (1) the trial court erred in denying its motion in limine and in overruling its objection to certain testimony by Joan Davis as hearsay; (2) the trial court erred in overruling the objection of New Plan to admission of a statement by a police officer to Morgan; (3) "the trial court erred in overruling New Plan's objection concerning testimony regarding the pecuniary status of New Plan because the evidence is irrelevant and substantially more prejudicial than probative"; (4) "the trial court erred in denying New Plan's motion for a new trial because the jury award of $100,000 in compensatory damages is excessive and not supported by the preponderance of the evidence"; and (5) the trial court erred in denying New Plan's motion for a new trial on the ground that the punitive damages award is excessive and is not supported by clear and convincing evidence.
*355 "In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party...." Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala.1999). See also Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala.1992), and Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992). A presumption of correctness attaches to a jury verdict, "if the verdict passes the `sufficiency test' presented by motions for a directed verdict and a JNOV." S & W Properties, Inc. v. American Motorists Ins. Co., 668 So.2d 529, 534 (Ala.1995). (Rule 50(a), Ala. R. Civ. P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by a trial court's denial of a motion for a new trial. Christiansen v. Hall, 567 So.2d 1338 (Ala.1990). "This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict winner], shows that the verdict was `plainly and palpably wrong and unjust.'" S & W Props., 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). "Whether to grant or deny a motion for new trial rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of that discretion." Colbert County-Northwest Alabama Healthcare Auth. v. Nix, 678 So.2d 719, 722 (Ala.1995). "Without a showing of such an abuse, the trial court's ruling must be affirmed." Id.
Morgan leased an apartment at The Club Apartments. In March 1995, Morgan was raped and injured by an ex-fiancé, who was also a resident at The Club Apartments. Morgan's injuries, physical and mental, prevented her from working for a period of time. Morgan testified that she was afraid to stay alone in her apartment. Because her ex-fiancé lived at The Club Apartments, Morgan wanted to move. In April 1995, Morgan spoke to the assistant manager of The Club Apartments and requested that she be allowed to terminate her lease early. Morgan informed the assistant manager about the rape and her resulting financial problems. On the assistant manager's instruction, Morgan completed the necessary paperwork to terminate her lease early. The assistant manager told Morgan that the manager would have to approve her request and that the manager would notify Morgan. Morgan testified that the manager never notified her whether her request for early termination of her lease had been approved.
In May 1995, New Plan purchased The Club Apartments and assumed control of the management of the property. New Plan hired a new manager, Marsha Babineaux, to oversee the management of the apartments. Morgan discussed her rent arrearage with Babineaux and made arrangements with her for the payment of the arrearage. Morgan testified that she asked Babineaux "if it was all right if [she] left [her] things in the apartment until June the 30th [the last day of her lease]." Babineaux told Morgan that "it was fine." Morgan told Babineaux that she planned to move out of her apartment by June 30, the date her lease ended. She testified that Babineaux told her that no one would go in her apartment and that no one would bother her belongings "until after that date." At this time, because her doctor advised her against staying alone, Morgan was living with her mother. Morgan testified that she needed to leave her belongings in her apartment because she was recovering from the rape and because her friends were helping her move her belongings *356 "a little bit at a time" to a storage unit. Around this time, Morgan also learned that she had a brain tumor, which made her very ill. She was working as much as she possibly could. Additionally, Morgan learned that doctors thought her sister was dying.
In the middle of June 1995, Morgan's friend William Hammock moved 15 or 16 boxes of books to Morgan's storage unit. Hammock had previously been to Morgan's apartment to have dinner. Dinner had been served on good china with crystal and silverware. He described Morgan's apartment, in June 1995, as containing a sofa; a television; a VCR; a dining room table and chairs; cassettes; oriental wall hangings; a large painting of a woman with a halo; an old dulcimer; and a keyboard. While moving the boxes, Hammock noticed that Morgan's sofa, dining room table and chairs, wall hangings, and television were still in the living room.
During the week before her lease expired, Morgan and a friend, Dwight Ballard, moved her sofa; her dining room table and chairs; a dresser; a bed; mattresses; and bookshelves from Morgan's apartment to her nearby storage unit. Ballard testified that many things were left in Morgan's apartment after he moved the furniture. Personal belongings remaining in Morgan's apartment were a stereo; speakers; stacks of paintings; stacks of pictures; stacks of portraits; "elaborately framed paintings"; glassware; china; and clothing.
When Morgan returned to her apartment on Sunday, June 25, 1995, her belongings were still in her apartment. On June 26, 1995, Morgan telephoned Babineaux to reassure Babineaux that she would have all of her belongings out by midnight of June 30, 1995, the last day of her lease. She also reassured Babineaux that she would pay her rent arrearage. Morgan testified that Babineaux told her that there was no problem. She stated that Babineaux assured her that no one would go into her apartment and bother her belongings.
About 4:00 p.m. on June 30, 1995, Morgan telephoned Babineaux and informed her that she was coming to get the remainder of her belongings, but that she was waiting to come until it stopped storming. Babineaux told Morgan that she was not sure if anything was left in her apartment, but she told Morgan that she would go check the apartment and would telephone Morgan later. Babineaux never telephoned Morgan. Morgan, however, testified that she telephoned Babineaux again, and that Babineaux told her that all of her belongings were gone. Morgan began crying and trying to talk to Babineaux. Babineaux told Morgan, "I don't have time for this shit," and slammed down the telephone.
Shortly after her telephone conversation with Babineaux, Morgan, accompanied by her mother JoAnn Jones, returned to her apartment to see if any of her belongings were there. Morgan used her key to open the locked apartment door. After entering the apartment, Morgan and Jones searched every room and every closet for her belongings. However, the apartment was empty. Morgan and Jones went to the office of The Club Apartments. Morgan stated that she spoke to Babineaux, who ignored her. She testified that Loretta Moore, a New Plan employee, was present in the office. Morgan reminded Babineaux of the payment agreement. She stated that Moore confirmed the payment agreement, pulled out a note Moore had made confirming the payment agreement, and showed the note to Babineaux. Crying, Morgan asked for her belongings. Babineaux then grabbed Morgan by the arm and stated, "I don't have time for this *357 shit, get the fuck out of here." Pushing and pulling, Babineaux forced Morgan out of the office. At the same time, Moore gave Morgan the note confirming the payment agreement. Morgan stated that she went to the police to report her belongings as missing. She testified that a police officer recommended that she hire an attorney.
Morgan testified that included in her belongings discarded by Babineaux were Irish linen tablecloths and napkins given to her by her grandmother and her great-grandmother; wedding gifts; tapestries from China; family heirlooms; a silver tea service; crystal glassware; glassware from China; a silk wall hanging from Korea; photographs of her grandparents, her great-grandparents, her dying sister, and her friends; art supplies and paints; and paintings, one with an appraised value of $5,000; and her clothing. Morgan testified that she compiled a list of her belongings that Babineaux or other New Plan employees had removed. The list was introduced into evidence. On the list, Morgan identified each item and specified a current appraised or replacement value for each item. The value of Morgan's lost belongings totaled $46,679. Morgan testified:
"It wasn't the monetary loss that affected me so much, even though I'll never have enough money to replace all those things, but they were my grandmother's things and my great-grandmother and some things that have been in my family for 200 or 300 years. I can never replace any of that. And there's pictures of my sister and pictures of friends and family that were copies of things that only I had, and even the art work that waseven though some of the art work it was worth a lot of money, it was worth more to me because it had been given to me with love soand that on top of the other things that occurred around that time were devastating. It was devastating."
Morgan's mother JoAnn Jones confirmed the events described by Morgan. She testified that Morgan's apartment was empty and freshly painted. After discovering the empty apartment, Jones stated that Morgan "was almost in a hysterical state." She stated also that Morgan asked, "[W]hat have they done?" Jones told Morgan not to get excited, that they might have moved her belongings and stored them somewhere else. Morgan told her mother that Babineaux had promised Morgan that she would not go into Morgan's apartment until Morgan had moved all of her belongings from the apartment.
Jones testified that she and Morgan walked across the walkway to the apartment across from Morgan's apartment. Jones spoke to Joan Davis, who lived in the apartment. Jones then accompanied Morgan to the office of The Club Apartments. Jones stated that she asked Babineaux where Morgan's belongings were. Babineaux stated that they were in the dumpster. Jones asked Babineaux when she had placed Morgan's belongings in the dumpster, and Babineaux replied, "This morning." Morgan and her mother looked in the dumpster, but it was empty.
Jones testified that, after Morgan learned her belongings were gone, she became depressed, cried "all the time," and refused to eat. She stated that she had to take Morgan to a doctor because Morgan was greatly upset about losing all of her belongings and about learning that her sister was dying. Jones stated that Morgan was very upset but she "mostly [was upset about] the things that [Morgan's] grandmother who had passed away a year before had given her and left her." She testified that Morgan said, "I felt like I have lost mypart of my life" because *358 Morgan's belongings "dated back to things that she had as a child, high school, cheerleader pictures, albums to appliances." Jones stated, "They even took her clothes. She didn't have anything to wear. Took her shoes and her clothes. She had what she had on. So, we had to even go and buy her some things to wear. She had nothing. Everything was gone."
Morgan's neighbor Joan Davis testified by deposition that Morgan and her mother visited her on the Friday on which Morgan had planned to move her belongings. She stated that Morgan told her that everything was gone from her apartment, although Morgan had spoken with Babineaux and had made arrangements to move her belongings from her apartment by Friday.
Davis testified that she had seen Babineaux and maintenance people enter Morgan's apartment before Morgan came to see her on Friday. She stated that Kathy, the maid who cleaned the apartments at The Club Apartments, and Ted, the maintenance man there, told her that Babineaux had sent them to clean out Morgan's apartment and that Kathy and Ted had told Babineaux that, usually when a tenant left belongings in an apartment, they held the items for at least 90 days to give the tenant time to collect his or her belongings. Davis testified that Ted and Kathy told her that Babineaux told them that she was not holding Morgan's belongings. She instructed them to take Morgan's clothes to Goodwill Industries and to throw the rest of her belongings in the dumpster. Davis stated that Ted and Kathy were very upset that Babineaux told them to dispose of Morgan's belongings. Later, Kathy told Davis that she had seen two of Morgan's lamps in Babineaux's office. Davis stated that Kathy asked Davis to get in touch with Morgan and to tell Morgan about the lamps so that Morgan could get her lamps.
Joseph Bosco, vice president of the apartment divisions of New Plan, testified by deposition that he produced records kept in the local, district, or home offices of New Plan. Bosco produced a letter dated August 2, 1995, from Morgan's attorney to the manager of The Club Apartments:
"I represent [Morgan], a former tenant of your apartment complex.... Your firm unlawfully removed my client's property from her apartment. Demand is hereby made for you to return all property of hers in your possession immediately. I look forward to your prompt reply."
Bosco produced also a letter dated August 14, 1995, from Gina Poff, a district manager for New plan, to Bosco. The letter specified the reasons and circumstances of the termination of Babineaux. The reasons for Babineaux's termination included "[d]ishonesty when relating incidents pertaining to the operation of [The Club Apartments]," "[d]id not follow proper procedure regarding personal effects left in units after tenants vacate," and a "[l]ack of professionalism and respect demonstrated when addressing subordinates and [tenants]." Bosco produced another letter dated August 14, 1995, from Poff to Morgan's attorney:
"I am in receipt of your correspondence regarding the above listed case file. Unfortunately we have no information regarding this matter. To our knowledge the apt. was vacated and there were no remaining personal items left.
"It is the policy of the company to hold any and all personal items for a 30 day period unless otherwise advised by the owner(s). If in the future we have further information to offer we will contact you immediately."
*359 Last, Bosco produced a letter dated August 18, 1995, from Poff to Morgan's attorney. This letter was identical to the letter of August 14, 1995, except that the former letter was carbon copied to the "N.Y. Office Operations," "N.Y. Office Legal," "Field Operations District Office," and "Site File."
Testifying by deposition, Gina Poff stated that she terminated Babineaux for, among other things, not following "proper procedure regarding personal effects left in units after tenants vacate" and for lying to Poff about hiring her brother as a maintenance man. Poff stated also that her reference to Babineaux's failure to follow proper procedure regarding a tenant's personal belongings was specifically based upon Babineaux's disposal of Morgan's belongings. Poff testified that New Plan's procedure was to inventory any belongings of value left in an apartment, to photograph the belongings, and to store the belongings for 30 days. According to Poff, Morgan's belongings were not photographed, inventoried, or stored.
In investigating the loss of Morgan's belongings, Poff questioned Babineaux. Babineaux told Poff that she inspected Morgan's apartment to see whether it was vacant. Babineaux told Poff that she found Morgan's apartment vacant but found "a couple of belongings such as older clothes, junk that people leave behind when they move that they don't want to take with them." Babineaux said she threw away the items she found in Morgan's vacant apartment. Poff stated further that Babineaux told her that Babineaux contacted the "emergency contact person on [Morgan's] application," Morgan's former boyfriend who lived at The Club Apartments and whom Morgan had reported to Babineaux as having raped Morgan. Babineaux told Poff that Morgan's former boyfriend told her to dispose of any items remaining in the apartment. Poff did not question anyone except Babineaux about Morgan's missing belongings.
The trial judge instructed the jury on the elements of conversion, compensatory damages, mental anguish damages, and punitive damages. Counsel for New Plan did not object to any of the trial judge's instructions. The jury returned a verdict in favor of Morgan and against New Plan, and awarded Morgan $100,000 in compensatory damages and $100,000 in punitive damages. The trial court entered a judgment on the verdict accordingly.
New Plan moved for a new trial. Following a hearing, the trial court entered a postjudgment order reviewing the punitive damages award according to the standards set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). The order reads, in pertinent part:
"The factors to consider include:
"(1) that the punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendants' conduct as well as to the harm that actually occurred;
"(2) the degree of reprehensibility of the defendants' conduct;
"(3) if the wrongful conduct was profitable, punitive damages should remove the profit;
"(4) the financial position of the defendants;
"(5) the cost of the litigation;
"(6) if criminal sanctions have been imposed on the defendants; and
"(7) if there have been other civil actions against the defendants based upon the same conduct.

*360 "Green Oil Company v. Hornsby, 539 So.2d [at] 222-24.
"Under the Gore factors the court must consider the degree of reprehensibility involved, the ratio of punitive to compensatory damages, and the imposition of civil or criminal penalties for similar conduct.
"The harm in the present case was great; [Morgan's] only assets were the property in her apartment. Family mementos and family photographs are not replaceable. [Morgan] did not have sufficient income or assets to replace the other items. The type of conduct engaged in by the defendants is likely to cause grievous harm and did so in this case.
"[New Plan's] conduct is highly reprehensible with no redeeming reason or excuse. The actions of [New Plan's] manager in ordering [New Plan's] employees to clean out the apartment were conscious, willful, and oppressive. Furthermore, [New Plan] engaged in deception and cover-up. At the time the defendants terminated [Babineaux], senior management wrote [Morgan's] counsel denying that there was any property in the apartment when [New Plan's] employees entered. The fact that property was in the apartment and that [New Plan's] employees Ted Former and Kathy Haeni had relevant information about the property that was in [Morgan's] apartment was demonstrated by the testimony of Joan Davis. Although [Morgan] made a formal demand for the return of her property, [New Plan's] senior management made no effort to contact its employees with relevant information regarding this matter. These employees were no longer employed at the time of trial.
"[New Plan] made no showing of any financial hardship. Documents referred to in the hearing on the motion [for new trial] such as the deed and bill of sale show substantial assets and net worth. Testimony indicates that [New Plan] is a national organization with property in other states.
"As to the constitutional issues referred to in [Gore], the court notes the reprehensibility stated above. Compensatory damages in this case included mental anguish. There was direct evidence by [Morgan] and her mother describing the magnitude and the degree of the mental anguish. The mental anguish component is not excessive. The ratio of punitive damages to compensatory damages does not fall outside the Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524 (Ala.1997), benchmark of 3:1. The ratio here is acceptable considering the degree of reprehensibility of [New Plan's] acts. [New Plan] did not suggest any applicable criminal or civil penalties for similar conduct and did not put on any evidence that [it] had been subjected to any other criminal or civil penalties.
"The award of punitive damages was not excessive under the facts in this case.
"The Motion for [a] New Trial is denied."

I. Issue of Hearsay Statements
New Plan argues that the trial court erred in denying its motion in limine and in admitting the testimony of Joan Davis about statements made by employees of New Plan.
At trial, Morgan presented the deposition testimony from her former neighbor Joan Davis:
"[PLAINTIFF'S COUNSEL]: Did you have an occasiondid you have a conversation or hear of a conversation with anyone from me [sic] who worked for the *361 apartment complex, the maintenance man or Kathy, the cleaning woman?

"A: Uh-huh.
"[PLAINTIFF'S COUNSEL]: Regarding what happened to [Morgan's] property?
"A: I did." (Emphasis added.)
This particular testimony was introduced without objection. It establishes that Kathy was the cleaning woman who worked for the apartment complex. There is no genuine dispute that the owner-operator of the apartment complex is the defendant.
Noteworthily, New Plan did not, either before or after the above-quoted exchange, challenge Kathy's status as its employee-housekeeper. Indeed, the trial judge instructed the jury:
"There has been evidence presented to you with regard to some of the employees of the defendant. There has been no issue made as to whether or not those employees indeed were agents working with the defendant. So, that's not an issue in the case...." (R. 262.)
New Plan did not object to the trial judge's instruction. New Plan's objection to Joan Davis's testimony, interposed only after her last answer quoted above, incorporated only the grounds included within New Plan's motion in limine. The motion in limine itself characterized Kathy as New Plan's housekeeper. The motion in limine did not object to an absence of proof that Kathy was New Plan's housekeeper. Rather, the motion in limine objected only that the housekeeper would not have authority to speak for New Plan. Thus New Plan's allowing Morgan to establish at trial before the jury that Kathy was New Plan's cleaning woman was no lapse or oversight.
"`[A]cts and declarations of one whose agency is the subject of inquiry, though incompetent when there is no other evidence of agency or of ratification, become competent for consideration in determining both the fact of agency and the scope of authority originally given, when shown in connection with other evidence of agency.'"
Warren Webster & Co. v. Zac Smith Stationery Co., 222 Ala. 41, 44, 130 So. 545, 547 (1930) (quoting Birmingham Mineral R.R. v. Tennessee Coal, Iron & R.R. Co., 127 Ala. 137, 145, 28 So. 679, 681 (1900) (emphasis added)). Thus Kathy's out-of-court declaration, as recounted by the witness Joan Davis after the trial court overruled New Plan's objection, was admissible to prove both the fact of Kathy's agency and the scope of her authority since Morgan had already established her status as New Plan's cleaning woman. The testimony which New Plan challenges as hearsay reads:
"[PLAINTIFF'S COUNSEL]: Well, as best you could straighten it out, what did Kathy tell you?
"A: They said that Marsha [Babineaux] had sent them in to clean out the apartment and they were upset because they told Marsha that usually when somebody left that they didn't get all of their things. They took them all over to the office for at least 90 days, you know, gave the person time to come get them. Marsha said she wasn't going to do that, said just to dispose of them, to take the clothes and give them to Goodwill and everything else throw in the dumpster."
The exchange follows the trial court's overruling New Plan's objection invoking its motion in limine. New Plan did not object to this testimony on the ground that the witness apparently recounted a sort of conglomerate out-of-court declaration by more than one declarant ("they") rather than just the declarant Kathy. Thus, considering the tendencies of the testimony *362 most favorable to the verdict winner, as we must in our review, we must deem Morgan to have established that, usually when a tenant left the apartments and did not get all of the tenant's things, Kathy would take them over to the office for at least 90 days to give the tenant time to come and get the things. This evidence, together with the unchallenged testimony that Kathy was New Plan's "cleaning woman," established both the fact of Kathy's agency and the scope of Kathy's agency. Warren Webster, supra.
Rule 801(d)(2)(D), Ala. R. Evid., authorizes the admission of "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Kathy's declaration established that what she did with a tenant's belongings was within the scope of her agency or employment. Consequently, Rule 801(d)(2)(D) authorized the trial judge's admission of Joan Davis's testimony to Kathy's declaration regarding her performance of her duty of handling the belongings of Morgan.

II. Irrelevant Statements
New Plan argues that the trial court erred in overruling the objection of New Plan to the admission of a statement made by a police officer to Morgan. New Plan argues that the testimony was irrelevant and prejudicial.
At trial, the following occurred:
"Q. Did the police do anything to get your property back?
"A. They advised me to get a lawyer.
"[Defense counsel]: We would object. Move to strike the answer as nonresponsive and also hearsay."
"When the grounds for an objection are stated, this impliedly waives all other grounds for the objection to the evidence; and the objecting party cannot predicate error upon a ground not stated in the trial court, but raised for the first time on appeal." Nichols v. Southeast Prop. Mgmt., Inc., 576 So.2d 660, 662 (Ala.1991) (citations omitted). Because New Plan specifically objected to the testimony on the ground of hearsay, we do not address whether the testimony was irrelevant or prejudicial. Id.

III. Other Businesses
New Plan argues that "the trial court erred in overruling New Plan's objection concerning testimony regarding the pecuniary status of New Plan because the evidence is irrelevant and substantially more prejudicial than probative." New Plan specifically argues that the trial court erred in allowing evidence of the pecuniary status of New Plan. At trial, Morgan's attorney read from Bosco's deposition:
"`Q: Does [New Plan] have any other businesses other than owning and operating and managing apartment buildings?'
"[Defense counsel objects at trial]: Judge we would object to that question not being relevant to this issue, what other businesses they have.
"THE COURT: Was there an objection at the time?
"[Defense counsel]: No, sir, there was not.
"THE COURT: Overruled.
"`A: We also own and operate the shopping centers and we do'"
New Plan argues that, from the above question and answer read from Bosco's deposition, "the jury learned that New Plan, in addition to owning the apartment complex which was the subject of the lawsuit, also owns and operates other apartment complexes, copying centers and office space. This evidence could serve no other *363 purpose but to prejudice the jury in its attempt to assess liability and, most importantly damages in this matter." Brief, p. 18.
This Court has stated:
"We will not reverse a judgment `unless... the error complained of has probably injuriously affected substantial rights of the parties.' Rule 45, [Ala.] R.App. P.; Bianco v. Graham, 268 Ala. 385, 388, 106 So.2d 655, 657 (1958). The appellant bears the burden of proof on this issue. Roubicek v. Roubicek, 246 Ala. 442, 21 So.2d 244 (1945). This standard, which requires more than an allegation of `some possibility that the jury could get some adverse thought,' has not been met in this case."
Atkins v. Lee, 603 So.2d 937, 946 (Ala. 1992).
Rule 32(b), Ala. R. Civ. P., reads:
"Objections to Admissibility. Subject to the provisions of subdivision (d)(3) of this rule, objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."
Rule 32(d)(3), Ala. R. Civ. P., reads, in pertinent part:
"(3) As to Taking of Deposition.

"(A) Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time."
Thus, the trial court erred in overruling the objection of New Plan on the ground that New Plan did not make the objection during Bosco's deposition. However, this case is different from the cases cited by New Plan in that Morgan's attorney did not during his closing argument inject the wealth of New Plan on the issues of liability or damages. New Plan has not shown that the single reference to New Plan's owning shopping centers substantially prejudiced its right to a fair trial. Thus, the error committed by the trial court is harmless error. Rule 45, Ala. R.App. P.

IV. Excessiveness of Compensatory Damages
New Plan contends that the trial court erred in denying New Plan's motion for a new trial on the ground that the compensatory damages award is excessive. Specifically, New Plan argues that the $100,000 compensatory damages award is excessive because the award is more than double Morgan's $46,679 property loss.
This Court has held:
"When a court is assessing whether compensatory damages are excessive, the focus is on the plaintiff. A court reviewing a verdict awarding compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. There is no fixed standard for ascertaining what are adequate compensatory damages for mental anguish. A determination of how much to award is left to the sound discretion of the jury, subject only to correction by the court if the jury clearly abused its discretion or was improperly influenced by passion or bias. When there is no evidence before the court of any misconduct, bias, passion, prejudice, corruption, or improper motive on the part of the jury, or when there is no indication that the jury's verdict is not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages. *364 See Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993)."
Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045, 1049 (Ala.2000). Ordinarily, in Alabama, a plaintiff cannot recover damages for mental anguish when a tort results in injury to property only, except when the tort is committed under circumstances of insult or contumely. Wal-Mart Stores, Inc. v. Bowers, 752 So.2d 1201 (Ala. 1999). Moreover, this Court gives "stricter scrutiny to an award of mental anguish [damages] where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced." Kmart Corp. v. Kyles, 723 So.2d 572, 578 (Ala.1998).
As already mentioned in this opinion, the trial judge instructed the jury on damages for mental anguish. Specifically, he gave instruction 31.84 from Alabama Pattern Jury Instructions: Civil (2d ed.1993). New Plan did not object to this instruction. Thus, the jury was authorized to include damages for mental anguish as part of the compensatory damages award to Morgan.
Again as already stated, Morgan placed a value of $46,679 on her belongings disposed of by Babineaux, a New Plan employee. Morgan and her mother, particularly her mother, testified to the mental anguish that Morgan suffered from Babineaux's disposal of Morgan's belongings. In fact, Morgan sought medical treatment because she was so distraught about the loss of her belongings. After reviewing the record and the aforementioned testimony, we conclude that the evidence of Morgan's special damages, together with the evidence of mental anguish suffered by Morgan as a result of actions of the employees of New Plan, support the jury's award of compensatory damages.
In its reply brief, New Plan argues for the first time that, because Morgan did not prove that Babineaux acted under circumstances of insult or contumely, Morgan was not entitled to damages for mental anguish. Because New Plan did not raise this issue in its initial brief or at trial, we "will simply treat such [issue] as not before the Court." Kennesaw Life & Acc. Ins. Co. v. Old Nat'l Ins. Co., 291 Ala. 752, 754, 287 So.2d 869, 871 (1973). See also Sanders v. Smitherman, 776 So.2d 68 (Ala.2000); Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774 (Ala.1998); C & S Family Credit of Alabama, Inc. v. McNairy, 613 So.2d 1232 (Ala.1992); Lunney v. Southern Ry., 272 Ala. 611, 133 So.2d 247 (1961).

V. Excessiveness of Punitive Damages
New Plan contends that the jury's award of $100,000 in punitive damages is not supported by clear and convincing evidence of intentional, reckless, wanton, or malicious conduct and is excessive.
An award of punitive damages must be supported by clear and convincing evidence "that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." § 6-11-20(a), Ala.Code 1975. Section 6-11-20(b) defines the terms "fraud," "malice," "wantonness," and "oppression":
"(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"(2) MALICE. The intentional doing of a wrongful act without just cause or excuse, either:

*365 "a. With an intent to injure the person or property of another person or entity, or
"b. Under such circumstances that the law will imply an evil intent.
"(3) WANTONNESS. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
". . . .
"(5) OPPRESSION. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."
"`Gross' is defined as inexcusable, flagrant, or shameful." Talent Tree Pers. Servs., Inc. v. Fleenor, 703 So.2d 917, 924 (Ala.1997). Additionally, § 6-11-27(a), Ala.Code 1975, provides:
"A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer, or other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act."
The record contains clear and convincing evidence that, although New Plan's manager Babineaux assured Morgan that no one would enter her apartment and that no one would remove her belongings from her apartment, Babineaux directed other employees of New Plan to remove Morgan's belongings from her apartment and to dispose of them before the termination date of her lease. Morgan's attorney demanded the return of Morgan's belongings. The investigation of the matter by New Plan's district manager Poff consisted of one conversation with Babineaux, who admitted she had disposed of Morgan's belongings after she, according to her, had spoken to Morgan's former boyfriend. Although Poff terminated Babineaux because of her disposal of Morgan's belongings, Poff wrote Morgan's attorney that New Plan "had no information regarding this matter" and that to New Plan's knowledge Morgan's apartment "was vacated and there were no personal items left." In the letter dated August 18, 1995, from Poff to Morgan's attorney, New Plan disavowed knowledge of the disposal of Morgan's belongings although Babineaux had already informed Poff of her actions. New Plan ratified Babineaux's wrongful conduct by joining in it by disavowing Babineaux's disposal of Morgan's belongings. See Holmes v. Sanders, 729 So.2d 314 (Ala. 1999). Moreover, Babineaux's wrongful conduct benefited New Plan by readying Morgan's apartment for the next tenant before the end of Morgan's lease. Morgan presented clear and convincing evidence that Babineaux's disposal of her belongings was intentional, malicious, or oppressive. The ratification of and benefit from Babineaux's wrongful conduct by New Plan support an award of punitive damages.
New Plan argues that the $100,000 award of punitive damages was excessive because "[t]his amount is more than twice the total replacement cost of all the items removed according to Morgan's evaluation." In the postjudgment order on punitive damages, the trial judge accurately *366 recognized the standards for determining whether a punitive damages award is excessive. The trial judge analyzed the $100,000 punitive damages award on the basis of the applicable standards. After carefully reviewing the record of wrongful conduct by Babineaux and New Plan, we agree with the trial judge that the $100,000 punitive damages award is not excessive. Thus, the judgment of the trial court is due to be affirmed.
APPLICATION GRANTED; OPINION OF MAY 12, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
HOUSTON, COOK, LYONS, BROWN, and ENGLAND, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
MADDOX, Justice (dissenting).
I believe Morgan laid an insufficient foundation for the admission of the hearsay statements made by persons alleged to be New Plan employees; therefore, I must dissent.
"It is well established that Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment.'" Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1566 (11th Cir. 1991) (quoting Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th Cir.1986) (citing Hoptowit v. Ray, 682 F.2d 1237 (9th Cir.1982))); see also Lowery v. Ward, 662 So.2d 224, 227-28 (Ala.1995) (holding that the burden rests on the offering party to lay the proper foundation for the admission of evidence). A showing that an agency relationship exists is the cornerstone of this foundation. Vicarious admissions are admissible only after the offering party presents independent evidence tending to show that the out-of-court declarant is an agent of the principal. Charles W. Gamble, McElroy's Alabama Evidence, § 195.01(3) (5th ed.1996). New Plan argues in its brief that "[w]ithout a reversal, defendants will be subject to liability based upon statements made by almost unknown individuals who repeat to a witness what was supposedly told to them by others."
Morgan asks this Court to consider two things that, I believe, do not advance her argument that she laid a proper foundation for the admission of the hearsay testimony. First, she contends that statements made by New Plan's trial counsel during voir dire examination of the jurors provided a proper foundation for the declarants' statements. Second, Morgan asserts that an exhibit to the deposition of Gina Poff, who was New Plan's district manager, established that the declarants were New Plan employees.[1]
New Plan responds to Morgan's argument that its trial counsel asked the jurors on voir dire about the two declarants by contending that an unsworn statement given *367 by trial counsel is not evidence. This contention, of course, is correct. See, e.g., American Nat'l Bank & Trust Co. v. Long, 281 Ala. 654, 656, 207 So.2d 129, 132 (1968) (where this Court held that statements of trial counsel regarding the execution of a note have no evidentiary value). Based on this principle of law stated in American National Bank, I would not consider the statements made by New Plan's trial counsel during voir dire in determining whether Morgan laid a proper foundation. The same principle of law applies to Morgan's second argument that the names of the two declarants appear on a list of employees that was attached to a deposition that was not introduced into evidence; without admission into the evidence at trial, that fact could not be considered as proof before the jury that the two declarants were agents of the defendant New Plan.[2]
The remaining evidence would then include a neighbor's trial testimony describing the declarants as being 1) a woman who was "Kathy that cleaned the apartments" and 2) "a maintenance man." Without being directed to any trial testimony that identifies New Plan as the principal or employer of the two declarants or that explains the scope of the declarants' alleged authority, I believe that the neighbor's testimony, alone, falls short of satisfying the burden imposed by Rule 801(d)(2)(D). Therefore, I would conclude that the trial court erred when it admitted the declarants' out-of-court statements, because, absent a proper foundation, the statements were inadmissible hearsay.
Insofar as I can tell from the briefs and arguments and from my examination of the record, these statements appear to have been the only evidence suggesting that New Plan was responsible for the disappearance of Morgan's property. Accordingly, I would reverse the judgment of the trial court.
HOOPER, C.J., and SEE, J., concur.
NOTES
[1] Morgan's arguments in her brief in support of the admissibility of these hearsay statements were as follows:

"Trial counsel for New Plan admitted in front of the jury that Kathy Haeni and Ted Fortner were employees of The Club Apartments. New Plan's witness, Gina Poff, admitted that Exhibit 1 to her deposition was New Plan's list of its employees. This document lists Ted Fortner as `Maint. Supv.' and Kathy Haeni as `Housekeeper.'".
Morgan also argues in her brief that Joan Davis, in her testimony, "identified Kathy as a maintenance employee of the defendant, namely `Kathy that cleaned the apartments.'" She also argued that Davis "identified Ted `a maintenance man' as one of the speakers," and that Davis testified that she actually saw Ted and Kathy going into the apartment during the week before Morgan came by on Friday.
[2] New Plan supplements its arguments on these points by emphasizing that the list was not before the jury and that even if it had been there was no evidence to show that either out-of-court declarant was an employee of New Plan.