THOMAS, Judge.
 

 Cecilia Lyles and John Burke reside at a house in Huntsville. Lyles has owned the residence since 1998; Burke began residing there with Lyles in 2002. Marilyn Kaye Downs lived in the neighboring house when she was a child; her mother, Thelma Franklin, still owned and resided in the house when, in 2003, Downs moved in with Franklin to care for her because of Franklin’s advanced age. Franklin later transferred ownership of the property to Downs. Lyles, Franklin, and Downs had a positive neighborly relationship.
 

 In the fall of 2008, Downs began dating Gary Dudley. He moved in with Downs and Franklin in either late fall 2003 or early 2004. According to Lyles and Burke, Dudley brought home “junk” automobiles and would work on them in the backyard. Lyles testified that she did not like looking at the automobiles and that she did not enjoy being in her backyard as much because of the reduction in her pri
 
 *89
 
 vacy. The fence between the two properties was quite old and was made of cedar posts and wire, and it afforded no privacy to either backyard.
 

 Lyles and Burke discussed putting up a wooden privacy fence to give them additional privacy in the backyard. In October and November 2004, Burke took down the old fence and began putting up a privacy fence, using the same postholes. According to Burke, the only comments made to him by Downs or Dudley were positive ones regarding the appearance of the new fence. According to both Burke and Lyles, neither Downs nor Dudley ever objected to the tearing down of the old wire fence or the erection of the new privacy fence.
 

 In the spring of 2004, Lyles was considering additional projects in her front yard, and, during a neighborly visit in Lyles’s yard, Downs told Lyles that she and Dudley were considering adding a pool and a two-car garage to their home. When Lyles mentioned this to Burke, they both became concerned about possible issues with drainage that might be caused by the proposed construction. Burke said that he consulted the city ordinances because he was concerned about the position of the driveway Dudley was planning to construct in relation to the property line. Burke said that he took copies of the ordinances over to Dudley and told Dudley that he might want to be aware of the requirements. According to Lyles, Dudley had a “meltdown” over Burke’s comments. Dudley admitted that he and Burke discussed where the driveway would be placed; however, Dudley did not testify that he and Burke had an argument over the matter.
 

 The relationship between the neighbors began to deteriorate quickly. Issues arose over the branches of a pecan tree; the tree grew on Lyles’s property, but some branches hung over the fence and caused debris to fall into Downs’s yard and onto the roof of her house. Downs and Dudley sought permission to trim the branches, but Lyles declined to give her permission. Concerned over the possibility that Downs and Dudley might try to trim the tree anyway, Lyles and Burke installed security cameras to monitor access into their yard. Downs and Dudley were irritated by the use of the cameras, and they eventually built a higher privacy fence that extended to their driveway to block them from view of a camera overlooking the side yard of Lyles’s home, which also overlooked the new driveway of Downs’s home.
 

 By this time, Downs and Dudley were claiming that the old wire fence had been built by Downs’s father on Downs’s property; Downs specifically argued that that fence did not, as Lyles contended, connect without interruption to Lyles’s house. Lyles contended that that fence extended from her house to the corner of the yard and then down the length of the backyard property line. Downs contended that the length of fence between the corner and Lyles’s house was not part of the original wire fence and instead was connected to a post that “butted up against” the original fence corner.
 

 Before Downs and Dudley built their extended privacy fence, the security camera overlooking the side of Lyles’s home caught numerous images of Dudley clearing debris of various nature off of his driveway by use of a leaf blower or a garden hose; the debris fell onto Lyles’s side yard. At one point, Dudley cleaned a substance off his driveway and then placed shovels full of dirt over the substance along the edge of the driveway. The camera also captured images of Dudley entering the space between the two privacy fences on numerous occasions, at least one time while carrying a bottle with an attached sprayer that Burke identified as a
 
 *90
 
 container of Round-Up, a weed killer. The backyard camera caught someone tearing a plastic door off the area between the privacy fences, someone peering through the fence built by Burke for a period, and someone spraying a liquid substance through that fence.
 

 In December 2004, Lyles and Burke woke one morning to discover several inches of water standing in the backyard. According to Burke, the water remained in the yard for three days. As a result of the flooding, Burke testified, the duct work under the house was filled with water and the insulation on the pipes underneath the house became saturated and fell off of the pipes. Burke testified that he had spent $100 replacing the insulation; however, he explained that he and Lyles did not have the money to have the duct work repaired or replaced. Lyles and Burke contended that the flooding resulted from the installation of the driveway and a sidewalk in Downs’s backyard and the placement of a door, a tailgate, and other items along the fence line by Downs and Dudley; Dudley contended that Burke’s construction of the privacy fence had resulted in Burke’s forming a dam along the bottom of the privacy fence, keeping the water confined in Lyles’s backyard.
 

 Lyles and Burke sued Downs and Dudley in September 2005, alleging three claims: that Downs and Dudley had trespassed on the property by disturbing their possession; that, in constructing the driveway, Dudley and Downs had negligently excavated the site and had violated the right to lateral support owed to Lyles and Burke; and “suggesting” a boundary-line dispute based on Downs and Dudley’s claim that the fence built by Burke was located on Downs’s property. Downs and Dudley answered the complaint and later asserted three counterclaims: invasion of privacy by intrusion upon seclusion, assault, and trespass based on the removal of the old wire fence.
 

 After numerous continuances and reassignments of the case to other judges, the case was finally tried to a jury on November 3, 2008. At the close of Lyles and Burke’s case and again at the close of all the evidence, Dudley and Downs moved for a judgment as a matter of law on each of the claims in the complaint; the trial court denied both motions. In addition, the counterclaims alleging assault and trespass were dismissed by agreement of the parties. The parties further stipulated that the boundary line between the properties was the fence line of the fence built by Burke. The following claims were submitted to the jury for its determination: Lyles and Burke’s claims of trespass and negligent excavation/violation of the right of lateral support and Downs and Dudley’s counterclaim of invasion of privacy. The jury returned a verdict in favor of Lyles and Burke on their trespass claim and awarded them damages of $1,100 each, returned a verdict in favor of Lyles and Burke on their negligent-excavation/violation-of-the-right-of-lateral-support claim and awarded them damages of $50 each, and returned a verdict in favor of Lyles and Burke on Downs and Dudley’s invasion-of-privacy counterclaim. The jury was requested to determine whether Lyles or Downs owned the privacy fence built by Burke. The jury specifically determined that Lyles owned that privacy fence. The trial court entered judgment on the jury’s verdict on November 13, 2008. After their postjudgment motion for a judgment as a matter of law and, in the alternative, for a new trial was denied by operation of law, Downs and Dudley appealed.
 

 On appeal, Downs and Dudley raise three issues. Downs and Dudley first argue that the judgment entered on the jury verdict on Lyles and Burke’s trespass
 
 *91
 
 claim should be reversed because the damages awarded were based on speculation and conjecture. Secondly, Downs and Dudley argue that the evidence was insufficient to support a verdict in favor of Lyles and Burke on their negligent-excavation/violation-of-the-right-of-lateral-sup-port claim and that the trial court erred in denying their preverdict and postverdict motions for a judgment as a matter of law regarding that claim, because, they assert, the doctrine is inapplicable to the circumstances of this case. Finally, Downs and Dudley argue that Lyles did not establish adverse possession of the old wire fence and that the jury could not have properly concluded that Lyles owned the privacy fence built by Burke.
 

 Standards of Review
 

 “A jury’s verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust.
 
 Crown Life Insurance Co. v. Smith,
 
 657 So.2d 821 (Ala.1994). In addition, a judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial will not be reversed unless it is plainly and palpably wrong.
 
 National Security Ins. Co. v. Donaldson,
 
 664 So.2d 871 (Ala. 1995). Because the jury returned a verdict for [Lyles and Burke], any disputed questions of fact must be resolved in their favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict.
 
 State Farm Auto. Ins. Co. v. Morris,
 
 612 So.2d 440, 443 (Ala.1993). In short, in reviewing a judgment based upon a jury verdict, this Court must review the record in a light most favorable to the appellee.
 
 Liberty National Life Ins. Co. v. McAllister,
 
 675 So.2d 1292 (Ala.1995).”
 

 Dempsey v. Phelps,
 
 700 So.2d 1340, 1342 (Ala.1997).
 

 “When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying a JML.
 
 Palm Harbor Homes, Inc. v. Crawford,
 
 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution.
 
 Carter v. Henderson,
 
 598 So.2d 1350 (Ala.1992). For actions filed after June 11,1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.
 
 Carter,
 
 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.
 
 Motion Industries, Inc. v. Pate,
 
 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.
 
 Ricwil, Inc. v. S.L. Pappas & Co.,
 
 599 So.2d 1126 (Ala.1992).”
 

 Delchamps, Inc. v. Bryant,
 
 738 So.2d 824, 830-31 (AIa.1999)
 

 The Trespass Claim
 

 Downs and Dudley argue that the judgment entered on the jury verdict on Lyles and Burke’s trespass claim should be reversed because the damages assessed on that claim were based on speculation and conjecture. Downs and Dudley men
 
 *92
 
 tion in their brief that Dudley’s entry between the fences would not have been prohibited and that Downs and Dudley had denied doing the acts complained of in the trespass claim. If this is an argument that the evidence was insufficient to support a judgment on the trespass claim, the argument is underdeveloped and unsupported by any authority. Rule 28, Ala. R.App. P., requires an appellant to “present his issues ‘with clarity and without ambiguity’ ” and to “fully express his position on the enumerated issues” in the argument section of her brief.
 
 Bishop v. Robinson,
 
 516 So.2d 723, 724 (Ala.Civ.App.1987) (quoting
 
 Thoman Eng’rs, Inc. v. McDonald,
 
 57 Ala. App. 287, 290, 328 So.2d 293, 294 (Civ.App. 1976));
 
 see also White Sands Group, L.L.C. v. PRS II, LLC,
 
 998 So.2d 1042, 1058 (Ala.2008). (“Rule 28(a)(10) requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived.”). Thus, we decline to consider the argument, if it was intended to be made, that the evidence is insufficient to support the judgment entered on the trespass claim and will consider only the argument concerning damages.
 

 Based on the evidence presented at trial, it appears that the claim of trespass against Downs and Dudley could have been based on actual physical trespass onto the property by Dudley, by the disturbing of the possession of both Lyles and Burke by projecting debris onto the property, and by the influx of water onto the property that Lyles and Burke claim resulted from actions taken by Downs and Dudley.
 
 See Rushing v. Hooper-McDonald, Inc.,
 
 293 Ala. 56, 59, 300 So.2d 94, 96 (1974) (“A trespass may be committed by disturbing the possession of the occupant, though the person committing the trespass does not actually go on the premises, as by throwing water or missiles on the land, or removing a partition fence, though the trespasser does not place his foot on the land.”). Typically, damages for trespass are based on “the difference in the reasonable market value of the property” before and after the injury caused by the trespass.
 
 Johnson v. Martin,
 
 423 So.2d 868, 870 (Ala.Civ.App.1982). When there is no actual damage to the real property resulting from the trespass, the owner of the property is entitled to nominal damages for the trespass.
 
 Johnson,
 
 423 So.2d at 870. Compensation for damage to personal property occurring during a trespass is recoverable in a trespass action.
 
 Id.
 
 In addition, “a plaintiff can recover for mental suffering which was the proximate consequence of a trespass to property if the trespass was committed under circumstances of insult and contumely.”
 
 Id.
 
 at 871. Punitive damages are also available to a plaintiff in a trespass action, even if only nominal damages are awarded, “if the trespass is attended by rudeness, wantonness, recklessness or an insulting manner or is accompanied by circumstances of fraud and malice, oppression, aggravation, or gross negligence.”
 
 Rushing,
 
 293 Ala. at 61, 300 So.2d at 98.
 

 Downs and Dudley argue that Lyles and Burke failed to establish that they suffered any damage as a result of any trespass committed. Although we agree that Lyles and Burke did not demonstrate any damage to the real property as a result of a trespass, they were entitled to nominal damages.
 
 Johnson,
 
 423 So.2d at 870. In addition, there was testimony establishing at least some damage to Lyles’s and Burke’s personal property as a result of a trespass, and those damages are recoverable in a trespass action.
 
 Id.
 
 Burke testified that he had replaced insulation underneath the house at a cost of $100. He also testified that he had re
 
 *93
 
 placed the plastic barrier between the fences at least 25 times and that the door cost “a couple of dollars.” Finally, Burke testified that the loss of the plants in the garden amounted to approximately $84. Thus, Burke’s testimony indicated that he and Lyles had suffered approximately $184 in damage to personal property.
 

 Downs and Dudley further argue that the evidence did not clearly and convincingly establish that any actions taken by Downs or Dudley were malicious, as required by Ala.Code 1975, § 6-11-20(b)(2), for the imposition of punitive damages. The evidence was such that the jury could have concluded that Dudley had entered Lyles’s property to purposefully damage the garden on her property. Other evidence indicated that Dudley had acted in a rude and insulting manner during those times he went in and out of the area between the fences and as he cleaned his driveway, because he often made vulgar gestures and, at least once, made an obscene comment directly to the security camera. Thus, we cannot agree that the evidence presented to the jury regarding the “rudeness,” “insulting manner,” and “malice” accompanying Dudley’s actions was not clear and convincing evidence warranting the imposition of punitive damages.
 

 Because there was evidence to support the imposition of punitive damages, i.e., “insult and contumely,” Lyles and Burke were also entitled to damages for mental suffering caused by any trespass.
 
 Johnson,
 
 423 So.2d at 871. “ ‘There is no fixed standard for ascertaining the amount of compensatory damages that may be awarded for emotional distress. The determination of how much to award is left to the sound discretion of the jury, subject only to review by the court for a clear abuse of that discretion.’ ”
 
 Union Sec. Life Ins. Co. v. Crocker,
 
 709 So.2d 1118, 1122 (Ala.1997) (quoting
 
 First Commercial Bank v. Spivey,
 
 694 So.2d 1816, 1326 (Ala.1997)). Lyles and Burke both complained that they had taken to wearing earplugs while outside their home tending to yard work because of the constant comments from Dudley. Burke also testified that he and Lyles had to give up gardening, a pastime that they had enjoyed, because their garden was killed off twice by actions taken by Dudley. They also installed security cameras as a result of their concern over Dudley and Downs trespassing after the dispute between the neighbors arose. Thus, the jury could well have considered mental suffering as part of its basis for its damages awards.
 

 Downs and Dudley also complain that the failure of the jury to specify what portion of the damages awards were made for compensatory or for punitive damages indicates that the entire sums awarded were intended to be compensatory damages. However, Downs and Dudley fail to cite authority for the proposition that we must assume that the entire awards were intended to be compensatory in nature,
 
 see
 
 Rule 28(a)(10), Ala. R.App. P., and our supreme court has indicated that, in a case in which the jury fails to specify the amount of each type of damages, a trial court, and by inference an appellate court, cannot designate which portion of the jury’s verdict was meant to be compensatory damages and which portion was meant to be punitive damages.
 
 City Realty, Inc. v. Continental Cas. Co.,
 
 623 So.2d 1039, 1045 (Ala.1993). Furthermore, because Downs and Dudley did not object to the use of the verdict form employed by the trial court, which did not require the jury to specify the amount of each type of damages awarded, as required by Ala.Code 1975, § 6-11-1, any error based on that ground cannot serve as a basis for reversal because it was not
 
 *94
 
 argued to the trial court.
 
 See Green Tree Acceptance, Inc. v. Standridge,
 
 565 So.2d 38, 46 (Ala.1990).
 

 In conclusion, because the jury determined that Dudley and Downs committed trespass and because the evidence supports a conclusion that any such trespass was committed with malice, rudeness, insult, and contumely, the jury was permitted to award nominal damages, damages for the destruction of Lyles’s and Burke’s personal property, mental-anguish damages, and punitive damages. Because the jury did not apportion its damages in its verdict, we cannot determine whether the award of compensatory damages exceeds the amount of actual damages proven by Lyles and Burke. Reviewing the evidence in the light most favorable to Lyles and Burke, we conclude that the jury’s assessment of damages was supported by the evidence, and we decline to disturb the judgment entered on its verdict.
 

 Negligentr-Excavation/Violation-of-the-RighCof-Lateral-Support Claim
 

 Downs and Dudley also appeal the jury’s award of $50 each in damages to Lyles and Burke on their claim of negligent excavation/violation of the right of lateral support. They argue that the doctrine of the right of lateral support has no application to the facts of this case and that the trial court erred by failing to grant their preverdict and postverdict motions for a judgment as a matter of law on that claim. We agree.
 

 The right of lateral support is a common-law doctrine embodying “[t]he principle[] that the owner of land has a right to lateral support from the adjoining soil, and that the adjacent proprietor cannot remove the earth to such an extent as to withdraw the natural support of his neighbor’s soil, without being liable for the injury.”
 
 Moody v. McClelland,
 
 39 Ala. 45, 48 (1863). The doctrine applies only to the support of land in its natural state.
 
 Id.
 
 at 49. Although a landowner has the right to excavate his land up to his boundary line, his excavation may not rob his neighbor of lateral support of the land such that his neighbor’s land collapses.
 
 Harding v. Bethesda Reg’l Cancer Treatment Ctr.,
 
 551 So.2d 299, 301 (Ala.1989). Thus, liability under the doctrine occurs when an adjoining owner excavates his property so that the loss of the natural support of his neighbor’s land causes the neighbor’s soil to be disturbed or to fall away.
 
 Nichols v. Woodward Iron Co.,
 
 267 Ala. 401, 405, 103 So.2d 319, 323 (1958) (quoting 1 Am.Jur.
 
 Adjoining Landowners
 
 § 25).
 

 No facts in the present case indicate that Downs and Dudley performed any excavation that resulted in the deprivation of lateral support from Lyles’s property. According to the complaint, the basis for the negligent-excavation/violation-of-the-right-of-lateral-support claim asserted by Lyles and Burke was the flooding event that they claim was caused by the installation of the driveway by Downs and Dudley. However, as noted above, the influx of water across Lyles’s property was a trespass. The evidence at trial did not support a negligent-excavation/violation-of-the-right-of-lateral-support claim, and the theory is legally inapplicable to the facts of this case; thus, the trial court erred in denying Downs and Dudley’s preverdict and postverdict motions for judgment as a matter of law on that claim.
 
 See Bryant,
 
 738 So.2d at 830-31. We therefore reverse the judgment, entered on the jury’s verdict, awarding Lyles and Burke each $50 for negligent excavation/violation of the right of lateral support.
 

 Boundary-Line Claim
 

 Finally, Downs and Dudley assert that the jury’s determination that Lyles owned the privacy fence built by Burke
 
 *95
 
 was not supported by the evidence. They argue, relying on
 
 Mardis v. Nichols,
 
 393 So.2d 976 (Ala.1981), that Lyles did not establish the elements of adverse possession so as to entitle her to a verdict in her favor. Specifically, Downs and Dudley argue in their brief that Lyles “would not have a claim to the property line by adverse possession” because she had not owned her house for 10 years at the time she filed her action. They also state in their brief that “there is no need to rely on exclusive possession alone in order to decide who the owner of the fence line was.” Downs and Dudley make no further arguments concerning the ownership of the fence itself.
 

 Because the parties stipulated that the boundary line was the fence line, we cannot agree that Lyles had to prove adverse possession for 10 years to establish a claim “to the property line.” A stipulation negates the requirement that a party prove a particular fact or element of a claim.
 
 Evans v. Alabama Prof l Health Consultants, Inc.,
 
 474 So.2d 86, 88 (Ala. 1985) (quoting
 
 Black’s Law Dictionary
 
 1269 (rev. 5th ed.1979), quoting in turn
 
 Arlington v. State,
 
 233 So.2d 634, 636 (Fla.l970))(emphasis omitted) (“A stipulation is defined as a ‘voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate need for proof or to narrow [the] range of litigable issues.’ ”). Therefore, because they stipulated to the establishment of the boundary line between the parties, Downs and Dudley cannot now argue that Lyles presented insufficient evidence of her adverse possession of the fence line, and we affirm the judgment entered on the jury’s verdict regarding the ownership of the privacy fence built by Burke.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.